Argued and submitted July 9, affirmed November 7, 2012

In the Matter of A. W. B.,
a Child.
## DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

## M. M. B.,
*Appellant.*

Washington County Circuit Court J100160;
Petition Number 01J100159M;
A150296 (Control), A150707

290 P3d 891

Megan L. Jacquot argued the cause and filed the brief for appellant.

John R. Kroger, Attorney General, Anna M. Joyce, Solicitor General, and Laura S. Anderson, Senior Assistant Attorney General, filed the brief for respondent.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

NAKAMOTO, J.

**NAKAMOTO, J.**

Mother appeals the juvenile court's order denying dismissal of jurisdiction and wardship over her son, A, and the court's permanency judgment, changing the permanency plan from reunification to a durable guardianship. First, mother contends that the wardship should have been dismissed because she adequately addressed the two bases for the court's jurisdiction; otherwise, she lacked notice as to what she must do to prevent the state from continuing wardship. Second, mother challenges the legal grounds for the permanency judgment, arguing that, contrary to the juvenile court's conclusions, the evidence showed she had made sufficient progress towards reunification, and A could safely return home. Third, mother contends that the judgment is defective under ORS 419B.476 for lack of one finding and insufficient specificity in another. For the following reasons, we affirm.

The parties do not request that we exercise our discretion to undertake *de novo* review, ORS 19.415(3)(b), and we decline to do so. *See* ORAP 5.40(8)(c) (we exercise *de novo* review "only in exceptional cases"). Therefore, we are bound by the juvenile court's findings of historical fact so long as there is any evidence to support them, and we review the juvenile court's conclusions for errors of law. *Dept. of Human Services v. C. Z.*, 236 Or App 436, 442, 236 P3d 791 (2010). When the juvenile court does not make findings on disputed issues of fact but evidence supports more than one factual conclusion, we presume that the court decided those issues in a manner consistent with its ultimate conclusion. *State v. S. T. S.*, 236 Or App 646, 655, 238 P3d 53 (2010).

## I. FACTS

### A. *Background*

Mother has two children, daughter O and son A, but only A is the subject of this appeal. In 2010, mother was involved in a physical altercation with O, who is four years older than A. Mother strangled O, and A had to come into the room to pull his mother off his sister. Apparently, that incident was alcohol-related. Subsequently, DHS removed

A, who was 14 years old, from mother's custody and filed a petition for the juvenile court to assume jurisdiction over him. After a friend of the children reported the incident, mother also was arrested for assaulting O.

Mother pleaded guilty to misdemeanor fourth-degree assault and strangulation of her daughter, and the criminal court entered a "no contact" order, which prohibited mother from contacting her children. As part of mother's sentence of probation, she was required to attend alcohol treatment, parenting classes, and mental health treatment. After mother successfully completed those programs, the criminal court modified her probation conditions to allow her to have contact with her children.

In the juvenile dependency proceeding, mother did not contest the allegations in the petition, as amended in her admissions. Those admissions were two-fold:

> "The conditions and circumstances endanger the welfare of said child by reason of the following facts:
>
> "A. Mother entered a guilty plea to Misdemeanor Assault IV and Strangulation of said child or said child's sibling.
>
> "B. Said child and said child's sibling report that mother has an alcohol problem that disrupts her ability and availability to adequately and appropriately parent and that makes her a danger to said child."

In May 2010, the juvenile court entered a combined jurisdictional and dispositional judgment based on those admissions, allowed DHS to filed an amended petition to conform to the admissions (which DHS filed), and made A a ward of the court. The court ordered DHS and mother to enter into and to abide by a written Action Agreement, an unsigned document attached to the judgment.

The Action Agreement listed safety threats to A and "the changes in cognitive, behavioral or emotional protective capacities the parents must make and demonstrate to increase their ability to keep [A] safe in relation to the Safety Threats." Safety threats included A's fear of the "home situation" and mother's violent or dangerous and impulsive behavior; mother's extremely negative perceptions of A; and

mother's lack of parenting skills, knowledge, and motivation to ensure A's safety. The Action Agreement stated that mother must actively participate in services and complete drug and alcohol and psychological assessments and follow any ensuing recommendations, plus comply with the terms of her probation. The Action Agreement also stated that mother understands that the changes she must make "must be noticed over time by significant others, including my child(ren), my caseworker, and other professionals."

After various initial placements, A was placed with a foster parent, Schwartz, who was mother's former partner. A also was evaluated by CARES Northwest (CARES). DHS developed a "Child Welfare Case Plan" and a "Child Specific Case Plan," stating that the primary permanency plan was reunification with mother and the concurrent alternative plan was guardianship.

B. *Combined Hearing*

In June 2011, mother moved to have jurisdiction and wardship over A dismissed because the conditions or circumstances alleged in the jurisdictional judgment no longer existed. Mother also contended that it would be improper for the court to continue wardship because the amended petition did not put her on notice of what she must do to prevent the state from continuing jurisdiction over A. A month later, DHS filed a notice of intent to change the permanency plan from reunification to guardianship at the permanency hearing. The court held a consolidated hearing on both mother's motion to dismiss and the permanency plan.

At the hearing, Crooke, the assigned DHS caseworker, testified as to all the services DHS provided to help reunify the family. Crooke explained that DHS offered mother housing assistance; paid mother's first deposit on her apartment; provided parent training sessions; provided both individual and family counseling; and provided supervised visits with A until mother and A arranged visitation on their own. Crooke also testified as to mother's relationship with A. Crooke testified that mother would get into arguments with A during visits and, after counseling sessions, mother would fight with him over the phone, and mother would harass him with text messages.

Barron, a therapist who provided family counseling to mother and A, testified as to mother's progress toward reunification. Barron explained that the goal of the family counseling sessions was to improve communication and to address previous history, which would help facilitate A's return home. To resolve emotional and psychological issues, Barron explained the importance of mother taking responsibility for her past abusive behavior. Barron described mother as defensive when challenging topics were discussed during family counseling. Barron also testified that mother and A would argue after counseling sessions. DHS submitted into evidence Barron's parent completion form reports that assessed mother's progress in family and individual therapy. In those reports, Barron explained that mother expressed a desire to improve on her parenting practices. Barron's reports also stated that A maintained that his preference was to live with Schwartz over mother, that A did not believe that mother's behaviors had changed, and that A was resistant to spending time with mother outside of counseling. Barron recommended that, before they could be reunited, the family spend more time together outside of therapy.

A also testified at the hearing. He explained that when he would visit mother outside of counseling sessions, he would have verbal arguments with her and was concerned that future arguments could escalate to the point that they would become physical. A also described an incident in which mother, who was angry, started to drive away with the car door open while A was attempting to remove his backpack from the car; A could have been hit by the car door. He was also concerned about whether mother would remain sober after her probation ends. For him to feel safer around mother, A explained that it was important to him that mother admit to strangling his sister and take responsibility for her previous abusive behavior.

DHS provided the juvenile court with the CARES evaluation of A from 2010. CARES reported that A's history and evaluation were "diagnostic of chronic maltreatment" by mother, including ongoing emotional and physical abuse and a long history of "supervisional neglect." The examiner, who had a master's degree in social work, had recommended

individual counseling for A and no visitation with mother unless A was established in therapy and his individual therapist recommended visits.

DHS also submitted into evidence a report by Dr. Munoz, a clinical psychologist, who had evaluated A in 2011. In that report, Munoz described A as "a very intelligent * * *, thoughtful, competent young man who is very eloquent in expressing what he feels * * * is best for him." Munoz concluded that A did not present any current psychological issue that would require further treatment. But based on reports by DHS, clinical interviews of A and foster parent Schwartz, the CARES evaluation, an earlier psychological evaluation of A from 2010, and assessment tools, Munoz's professional opinion was that it was in A's "best interests to have his wishes respected in regards to permanency planning." Munoz also opined that, "[c]onsidering the high degree of unresolved anxiety and animosity [A] experiences around [mother], it would likely negatively impact his psychological adjustment to be returned to her at the current time."

Munoz also testified at the hearing about his evaluation of A. Munoz stated that A had indicated that mother was argumentative with him and that he was concerned that their fighting would continue. Based on A's description of his relationship with mother, Munoz explained that it would not be in A's best interest to return home. When asked by DHS whether it is important for a child to have trust and faith in his or her parent, Munoz responded that it is important for the parent to provide stability in the home to minimize the child's anxiety, depression, and acting out behaviors. Munoz also explained that, when a teenage boy does not trust or respect his mother, then her ability to parent is severely limited because she lacks parental authority, which may cause stress and arguments in the household.

Mother testified that she found individual and family counseling beneficial and was able to describe the skills she had learned from both parenting classes and counseling. Mother also testified that she had stopped consuming alcohol, and after she stopped, she noticed a change in her volatility and anger. She stated that she had not physically hurt either of her children since the strangulation incident in 2010. Mother also read a letter that she had delivered

to A on the day of the hearing. In her letter, she apologized for the assault involving O and A, assured A of her love for him, acknowledged that her problems had caused the family break-up, and indicated that she had learned to deal with things differently through counseling.

The juvenile court denied mother's motion to dismiss the wardship and changed the permanency plan to a durable guardianship under ORS 419B.366. Such a guardianship is under the auspices of the juvenile court, continuing "as long as the ward is subject to the court's jurisdiction * * *." ORS 419B.366(6). In the juvenile court's amended check-box permanency judgment, the court checked the box stating that "DHS has made reasonable efforts to reunify the family during the period under review at the permanency hearing, which is the period since the last review/permanency hearing." The juvenile court also determined that mother had not made "sufficient progress toward meeting the expectations set forth in the service agreement, letter of expectation and/or case plan, and the child cannot be safely returned to mother's care." Under the Findings and Orders section, the juvenile court checked a box stating that the case plan is changed to guardianship because,

> "notwithstanding the reasonable reunification efforts of DHS, the child cannot be safely returned to mother's [and] father's care at the time of the hearing, and the evidence does not support a determination under ORS 419B.476(4)(c) and (5)(c) that further efforts by the agency will make it possible for the child to safely return home within a reasonable time."

The juvenile court also found that guardianship was appropriate rather than adoption because of "the child's age, health and safety needs[,] sibling attachment[, and] attachment to a parent."

## II.  ANALYSIS

On appeal, mother raises three assignments of error. First, mother contends that the juvenile court erred in denying her motion to dismiss jurisdiction and wardship. Mother argues that she adequately addressed the allegations in DHS's jurisdictional petition; otherwise, the jurisdictional petition and judgment did not give her adequate notice as

to what she must do to prevent the state from continuing wardship over A. Second, as to the permanency judgment, mother argues that the juvenile court erred in finding that she had not made sufficient progress and that the child could not be safely returned to mother within a reasonable time. Third, mother argues that the permanency judgment was fatally flawed because it lacked written findings of fact as to why continued care of A was necessary.[1]

## A. *Jurisdiction and Wardship*

We begin with mother's assignment that the juvenile court erred in denying her motion to dismiss jurisdiction and wardship. Mother asserts that she adequately addressed all the conditions and circumstances alleged in DHS's amended petition for jurisdiction. Mother contends that she is entitled to a reversal because the juvenile court relied on facts extrinsic to DHS's amended petition, and, thus, she was not given an opportunity to address the court's concerns raised by those extrinsic facts. Mother primarily relies on *Dept. of Human Services v. G. E.*, 243 Or App 471, 479, 260 P3d 516, *adh'd to as modified on recons*, 246 Or App 136, 265 P3d 53 (2011), for support.

In *G. E.*, the mother argued that she had ameliorated the factual circumstances alleged in the jurisdictional judgment and that the juvenile court erred when it based its decision to continue jurisdiction and wardship on different factual circumstances. *Id.* at 478. We noted that it is "axiomatic" that a juvenile court cannot continue a wardship if the juvenile court based its decision on facts that have never been alleged in the jurisdictional judgment. *Id.* at 479. But because "'facts' come in many levels of specificity," *id.*, we determined that the relevant inquiry is whether the facts on which the court bases its continued jurisdiction depart from the petition in a manner that

---

[1] Mother also argues that, because there is no evidence in the record to support the court's conclusion to continue jurisdiction over A, mother's due process right to fundamental fairness was violated. *See State ex rel Juv. Dept. v. Geist*, 310 Or 176, 187, 796 P2d 1193 (1990) (concluding that due process requires that the court's procedural safeguards ensure that a termination proceeding is fundamentally fair). Because we ultimately conclude that the court's decision to continue jurisdiction and to change the permanency plan to guardianship is supported by the record, we need not address mother's due process argument.

"substantially affect a parent's rights," *id.* at 481. A parent's rights are substantially affected when neither the petition nor the jurisdictional judgment put a reasonable parent on notice as to what he or she must do to prevent the state from assuming or continuing jurisdiction over the child. *Id.* Accordingly, mother's argument depends in large part on what a reasonable parent would understand from the petition and jurisdictional judgment. The parties differ on that point and on the basis for the court's denial of mother's motion.

As previously noted, DHS's amended petition alleged two sets of conditions or circumstances for jurisdiction, which mother admitted: (1) mother had pleaded guilty to fourth-degree assault and strangulation; and (2) mother had an alcohol problem. Mother argues that she therefore had to and did address both her substance abuse and, as she frames it, her anger management problem. As the measure of her success, she points to the satisfaction of her service providers and probation officer with her progress. But, in mother's view, despite her progress, the court impermissibly relied on A's testimony that he did not believe "the patterns of [mother's] previous behavior had changed." Mother argues that neither the petition nor the jurisdictional judgment put her on notice that she would need to convince A that her behavior had changed.

Based on the allegations of the amended petition, the findings in the jurisdictional judgment, and the Action Agreement attached to the judgment, we agree that mother was on notice that she needed to address her alcohol abuse as well as her assaultive behavior and anger management problem. However, the Action Agreement directly contradicts mother's theory that she was not on notice that her progress could be measured by whether other people, including her son, observed a change in her behavior. Mother knew that the changes she must make "must be noticed over time by significant others, including my child(ren)." Moreover, as DHS contends, the juvenile court's decision to continue jurisdiction and wardship implicitly was based on mother's failure to adequately address her anger management problem, not simply on A's expressed beliefs. DHS also contends that relevant portions of the record besides A's

opinion that mother had not changed her behavior supports that decision. We agree with DHS.

Although there is no evidence that mother physically abused A or expressly threatened to do so during the wardship, the record supports the court's implicit finding that mother continued to have an anger problem, and mother's problem was significant enough to affect A's psychological adjustment. In the Child Specific Case Plan, Crooke, the DHS caseworker, reported that mother and A would get into arguments during visits after counseling sessions. At the hearing, Crooke testified that mother would fight with A over the phone and harass him with text messages. Barron, mother's family counselor, testified that mother was defensive during counseling sessions and would have verbal arguments with A after counseling sessions. Barron recommended that mother and A continue to spend more time together outside of counseling sessions before A could be reunited with mother. And, DHS introduced evidence that mother's anger would likely negatively impact A, as psychologist Munoz reported after evaluating A:

> "[B]ased on reports by DHS, [A] and his foster parent[,] there is still erratic, argumentative behavior on [mother's] behalf that at best makes others uncomfortable to be around her and question the degree of progress in managing her own mental health needs. Considering the high degree of unresolved anxiety and animosity [A] experiences around her, it would likely negatively impact his psychological adjustment to be returned to her at the current time."

In addition, the court had before it a history of mother's abusive behavior towards A over a course of years, and it heard testimony concerning a recent specific, potentially dangerous incident when mother started driving away in anger while A was standing next to the car with the door open. All of that was in addition to A's opinion that mother had not shown progress in controlling her anger. Accordingly, we conclude that the juvenile court did not err in determining that mother's anger management problem continued to be a basis for jurisdiction and wardship.

B.   *The Permanency Judgment*

Because it is potentially dispositive, we now turn to mother's third assignment of error that the juvenile court's permanency judgment failed to include the necessary written factual findings required by ORS 419B.476(5). *See State ex rel Juv. Dept. v. J. F. B.*, 230 Or App 106, 118, 214 P3d 827 (2009) (where a remand is necessary because the permanency judgment lacks determinations required by ORS 419B.476(5), our review of the merits of the permanency plan is premature). Specifically, mother argues that the court's permanency judgment did not state "why continued care" of A was "necessary as opposed to returning the child home" or "how she was deficient" in making progress to assume custody of A. Although mother did not preserve that contention, she was not required to do so under these circumstances. *See State ex rel DHS v. M. A. (A139693)*, 227 Or App 172, 181, 205 P3d 36 (2009) (although the parent did not request findings required by ORS 419B.476(5) at the permanency hearing, preservation principles were inapplicable when the findings were required in a later judgment, and the parent had no way of knowing that they would not be included).

Under ORS 419B.476(5), after the hearing, but within 20 days, the court is required to make the following written findings in a permanency judgment that changes a plan for the ward from reunification with parent to establishment of a legal guardianship:

"(a)   The court's determination required under subsections (2) and (3) of this section, including a brief description of the efforts the department has made with regard to the case plan in effect at the time of the permanency hearing;

"(b)   The court's determination of the permanency plan for the ward that includes whether and, if applicable, when:

"* * * * *

"(C)   The ward will be referred for establishment of legal guardianship[.]

"* * * * *

"(e)   If the court determines that the permanency plan for the ward should be establishment of a legal guardianship or placement with a fit and willing relative, the court's

determination of *why neither placement with parents nor adoption is appropriate*[.]"

(Emphasis added.)

Citing "ORS 419B.476," mother first contends that the permanency judgment failed to include a finding of why continued care was necessary as opposed to returning the child home.[2] DHS concedes that the court failed to include the required written findings in its permanency judgment. We conclude, however, that DHS's concession is not well taken, and we choose not to accept it, because the trial court's findings for a change of plan from reunification to legal guardianship were sufficient.

DHS assumes that mother's assignment of error relates to the requirements for findings in ORS 419B.476(5)(d) ("If the court determines that the permanency plan for the ward should be adoption, the court's determination of whether one of the circumstances in ORS 419B.498(2) is applicable."). DHS concedes that the judgment does not contain those findings. But because DHS asked the court to change the permanency plan from reunification to a durable guardianship, not adoption or a permanent guardianship, ORS 419B.476(5)(d) is inapplicable to this case. Rather, the relevant provision is ORS 419B.476(5)(e), quoted above, which outlines the necessary findings relating to a permanency plan change from reunification to a durable guardianship. We understand the first of mother's arguments—the judgment failed to state "why continued

---

[2] Mother also contends that the permanency judgment was defective pursuant to ORS 419B.449(2) and (3)(a)(A). We acknowledge that, at the end of the review hearing for mother's motion to dismiss, the court was required to enter findings of fact, ORS 419B.449(2), and state "[w]hy continued care is necessary as opposed to returning the child or ward home," ORS 419B.449(3)(a)(A). We have held, however, that when the court fails to make the findings required at the end of a hearing, and instead makes them later, the parent is required to preserve that claim of error. *See State ex rel Dept. of Human Services v. J. N.*, 225 Or App 139, 144, 200 P3d 615 (2009) (preservation rules are implicated when the statute requires the court to make particular findings of fact at the conclusion of a hearing); *accord Dept. of Human Services v. C. C.*, 253 Or App 271, 290 P3d 900 (2012). We have reviewed the record and conclude that mother's argument pursuant to ORS 419B.449(2) and (3)(a)(A) is unpreserved.

care" of A was "necessary as opposed to returning the child home"—to be a challenge to the absence of those findings.

An examination of the judgment indicates that the court did make the necessary findings as to why continued care of A was necessary. Among other things, the juvenile court was required to state findings specified in ORS 419B.476(2) in the permanency judgment. ORS 419B.476(5)(a). In part, ORS 419B.476(2) provides:

"At a permanency hearing the court shall:

"(a)  If the case plan at the time of the hearing is to reunify the family, determine whether the Department of Human Services has made reasonable efforts * * * to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."

The court found that DHS had made reasonable efforts to reunify the family, as specified in ORS 419B.476(2)(a), and provided a brief description of DHS's efforts towards reunification, ORS 419B.476(5)(a), namely, housing assistance, parent training, family counseling, individual counseling, and supervised visitation with the child. The court also found that mother had not made "sufficient progress towards meeting the expectations set forth in the * * * case plan, and the child cannot be safely returned to mother's care," as required by ORS 419B.476(2)(a) and (5)(a).

The juvenile court found that the reason continued care was necessary was because A could not be safely returned home to mother within a reasonable time. In the court's judgment, the court checked a box stating:

"The case plan of reunification should be changed to a different permanent plan, because: *notwithstanding the reasonable reunification efforts of DHS, the child cannot be safely returned to mother's [and] father's care* at the time of the hearing, *and the evidence does not support a determination* under ORS 419B.476(4)(c) and (5)(c) *that further efforts by the agency will make it possible for the child to safely return home within a reasonable time.*"

(Emphasis added.) The court also checked the box stating that the new permanent plan is changed to guardianship and that "[p]lacement of the child with a parent is not appropriate, because *** despite the reasonable reunification efforts of DHS, the child cannot be safely returned to a parent within a reasonable time." And with regard to whether adoption would be appropriate, the court checked the box stating, "Adoption is not appropriate, because the child's age[,] health and safety needs[,] sibling attachment(s)[, and] attachment to a parent make adoption unlikely and/ or inappropriate." Thus, contrary to mother's argument, the court's findings addressed "why neither placement with parents nor adoption is appropriate," as required by ORS 419B.476(5)(e).

In addition to her "missing finding" argument, mother argues that the judgment was defective based on a lack of specificity. She asserts that, under ORS 419B.476, the court was required to explain in the judgment how mother failed to make sufficient progress. Mother does not point us to any particular statutory language that requires the judgment to contain that additional explanation and specificity, and, although mother cites *M. A.*, *G. E.*, and *State ex rel Dept. of Human Services v. S. L.*, 211 Or App 362, 372, 155 P3d 73 (2007), in support of her argument, those cases are unavailing.[3] We therefore reject mother's challenge to the adequacy of the findings in the permanency judgment.

C. *Permanency Plan*

Lastly, mother assigns error to the juvenile court's conclusions that mother had not made sufficient progress and that A could not be safely returned to mother within a reasonable

---

[3] In *M. A.*, we held that, because court changed the permanency plan from reunification to a planned permanent living arrangement, the judgment was required to include a specific factual finding, namely, a "compelling reason" for why it was not in the best interest of the children for them to return home or be placed in another permanent option, as required by ORS 419B.476(5)(f). 227 Or App at 183. In *G. E.* and *S. L.*, we did not address whether the court's permanency judgment contained the necessary findings required by ORS 419B.476; rather, we discussed whether the record supported the juvenile court's conclusion that the parent had not made sufficient progress. *G. E.*, 243 Or App at 483 (concluding that the court's decision to change the permanency plan from reunification to adoption was impermissibly based on factual circumstances extrinsic to the jurisdictional judgment); *S. L.*, 211 Or App at 373-74 (on *de novo* review, concluding that mother had not made sufficient progress).

time, determinations required by ORS 419B.476(2). To change the permanency plan from reunification to guardianship, the court must find that, despite DHS's reasonable efforts to reunify the family, the parent has not made sufficient progress for the child to safely return home. *S. L.*, 211 Or App at 372. We have held that "a parent's '[m]ere participation in services * * * is not sufficient to establish adequate progress toward reunification.'" *Dept. of Human Services v. N. S.*, 246 Or App 341, 351, 265 P3d 792 (2011), *rev den*, 351 Or 586 (2012) (quoting *S. L.*, 211 Or App at 372, (brackets in *N. S.*)). The "paramount concerns" in changing the permanency plan from reunification with parent are the child's health and safety. ORS 419B.476(2)(a); *see State ex rel Dept. of Human Services v. Shugars*, 208 Or App 694, 712, 145 P3d 354 (2006) (on *de novo* review, we noted that our "predominant consideration" in evaluating the parent's conduct and progress is the child's health and safety).

DHS does not dispute mother's contention that she had made sufficient progress towards remedying her alcohol abuse problem. The only disputed issue is whether mother made sufficient progress on her anger control problem. Mother completed anger management classes, individual counseling, family counseling, parenting classes, and substance abuse treatment. She contends that her progress in those services required a finding that A safely could be returned home within a reasonable time. Although mother admits that, at times, she would have disagreements with her son, in her view, the tension between them was normal because of A's age—he was 16 at the time of the hearing— and because they did not have regular contact outside of family counseling sessions. Even if A's allegations of her behavioral problems were taken as true, mother contends, those allegations are insufficient to support a finding that his welfare was endangered.

In response, DHS contends that, despite mother's participation in counseling and other services, mother has not sufficiently progressed in addressing her anger problem. DHS contends that mother's lack of progress is supported by evidence of mother's defensive behavior during counseling sessions, A's distrust of mother's ability to change, and the consistent arguments between mother and A. DHS also

contends that, because mother has not taken responsibility for choking A's sister and continues to be aggressive, she has not adequately addressed her anger issues. DHS asserts that the juvenile court implicitly and correctly determined that A's mental health would be at risk if he were returned home.

To her credit, mother participated in all the services provided by DHS and, at the end of the hearing, apologized to A for the assault involving O and A. However, we agree with DHS that the record supports the juvenile court's finding that, despite those services, mother had not made sufficient progress in addressing her anger problem, and the court's implicit finding that mother's problem was significant enough to affect A's mental health and psychological adjustment and to prevent his return home within a reasonable time. Crooke testified that mother would argue with A, both during and after counseling sessions, and mother would harass A with text messages. And although there is no evidence that mother physically abused or threatened to abuse A during those arguments, A testified that he was concerned that future arguments with mother could escalate and become physical. In fact, during one argument, mother sped off with the car door still open and the door could have hit A. And, the Munoz evaluation supports an implicit finding that A's emotional and mental health was at risk because of mother's anger problem. After evaluating A, Munoz opined that mother's aggressive and argumentative behavior "would likely negatively impact [A's] psychological adjustment." Munoz also testified that, because A did not trust or respect mother, it was likely that mother and A would have ongoing problems. The juvenile court, therefore, did not err in changing the permanency plan.

In sum, we conclude that the juvenile court did not err in denying mother's motion to dismiss jurisdiction and wardship. The juvenile court also made the necessary findings of fact in its permanency judgment, as required by ORS 419B.476(2)(a) and ORS 419B.476(5)(e). Lastly, we conclude that the record supports the juvenile court's judgment changing the permanency plan from reunification to guardianship.

Affirmed.