Argued and submitted March 1, reversed and remanded  April 24, 2013

In the Matter of A. L.,
a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent*,

*v.*

J. R. L.,
*Appellant.*

Clackamas County Circuit Court
101256J;
Petition Number 101256J01;
A152500

300 P3d 291

Kimberlee Petrie Volm, Deputy Public Defender, argued the cause for appellant. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Karla H. Ferrall, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

Mother appeals a permanency judgment, assigning error to the juvenile court's denial of her motion to dismiss jurisdiction and wardship over her daughter, A, and the change of the permanency plan from reunification to adoption. A was a ward of the court based on mother's admissions relating to exposure of A to risks of sexual abuse by A's father, a lack of suitable housing, and a failure to meet A's educational needs. Mother contends that the wardship should have been dismissed because she had adequately addressed those bases for jurisdiction and because the juvenile court improperly relied on a different basis for continuing jurisdiction—mother's mental health—as to which mother had not received required notice. In part, mother challenges the change of plan on the same basis, arguing that the Department of Human Services (DHS) failed to establish the insufficiency of mother's progress toward ameliorating the bases for jurisdiction that had been pleaded and proved. We conclude that the juvenile court erred in relying on facts extrinsic to the jurisdictional judgment in denying mother's motion to dismiss and in its determination of the permanency plan for A. Accordingly, we do not reach mother's other arguments, and we reverse and remand.

The parties do not request that we exercise our discretion to review this case *de novo*, ORS 19.415(3)(b), and we decline to do so. *See* ORAP 5.40(8)(c) (we exercise *de novo* review "only in exceptional cases"). Accordingly, we are bound by the juvenile court's findings of historical fact as long as there is "any evidence" to support them. *State v. S. T. S.*, 236 Or App 646, 655, 238 P3d 53 (2010). We review the juvenile court's conclusions for legal error. *Id.* When the juvenile court does not make findings on disputed issues of fact, but evidence supports more than one factual conclusion, we presume that the court decided those issues in a manner consistent with its ultimate conclusion. *Id.* We state the following facts consistently with those standards.

In 2010, DHS removed A, who was almost seven years old, from mother's custody and filed a petition for the juvenile court to assume jurisdiction over A. Father was a

convicted "predatory sex offender" and, as a condition of his parole, was ordered not to have contact with any minors, including A. Although mother was aware of father's condition of parole, she allowed him to have contact with A. At that time, mother and father were married and had been homeless for nearly two-and-one-half months, living in their van. While the family was homeless, A had not attended school.

At the juvenile dependency proceeding in March 2011, mother did not contest the allegations in the petition as amended. Mother stipulated to the following facts:

"2(a)   The mother has allowed the father, a registered sex offender, to live with her and her daughter which places the child at risk of harm.

"2(b)   The mother is in need of education and counseling to appreciate the risk of harm father presents to the child and learn how to protect the daughter from the father.

"2(c)   The mother lacks safe and stable housing in which to raise the child.

"2(d)   The mother failed to meet the educational needs of the child."

In March 2011, the juvenile court entered a combined jurisdictional and dispositional judgment based on those admissions, making A a ward of the court. The court's judgment stated that the case plan was reunification with mother and the concurrent plan was adoption. The judgment stated that the "DHS service agreement/letter of expectation is attached to and made a part of" the order finding A to be within the court's jurisdiction, and the judgment also contained the court's order that mother comply with the terms of that service agreement or letter of expectation.

The form that was attached to the jurisdictional judgment was entitled "Services Requested"; it contained a column of various preprinted items and two columns headed "MOTHER" and "FATHER." Some of the items under the column for mother had been checked off, including the following services or activities: "[p]sychological *** [e]valuation," with a handwritten notation stating, "Follow all

recommendations"; ensure that A have no contact with father; participate in individual counseling, again with the addition, "Follow all recommendations"; seek and maintain steady employment or reliable income adequate for self-support; "[s]afe and [s]table [h]ousing"; and continue with counseling at Options Counseling Services (Options).

After A was placed in DHS's custody, mother cut off contact with father. Additionally, pursuant to DHS's request, mother participated in the Family Sex Abuse Treatment (FSAT) program, a program provided at Options that is geared towards educating mother, a nonoffending parent, to appreciate the risk of harm that a sex offender like father presented to A. Although mother's attendance was inconsistent at times, she successfully completed the program.

Mother also completed parenting counseling through Options and a separate parenting class with another agency. Mother participated in individual counseling, albeit inconsistently, through Clackamas County Behavioral Health (CCBH). Mother was unsuccessful in obtaining employment and, although she eventually secured housing with friends, she did not have her own apartment or another housing situation, such as a place in a family shelter, that could safely accommodate both her and A.

In June 2011, mother participated in a psychological evaluation. Dr. Gillis, a licensed psychologist, evaluated mother and prepared a written report. Gillis determined that mother met the criteria for "Major Depressive Disorder, Recurrent, Moderate" and recommended that mother participate in individual therapy aimed at decreasing symptoms of depressed moods and continue with medication management of her mood symptoms. Gillis concluded that mother's "symptoms of depression are currently interfering with her ability to meet daily responsibilities. And, the [test] results *** suggest that a high level of distress is increasing the risk of neglectful or abusive parenting." In response to DHS's specific referral questions, Gillis determined that mother's "prognosis for benefitting from mental health services is good; however, it is difficult to determine with a sufficient degree of certainty whether she will actually address the

concerns that resulted in DHS involvement (i.e., keeping [A] safe from unsafe adults)."

Several months later, in August 2011, DHS submitted a report to the court summarizing mother's situation since the last court hearing. DHS stated that mother was diagnosed with depression and suggested that her "lack of follow through in multiple areas since the opening of this case * * * is likely a result of her untreated depression." In subsequent reports to the court, DHS noted that mother continued to suffer from depression and anxiety and that those mental health issues were related to her lack of follow through in finding employment and housing.

In August 2012, a year after DHS first notified the juvenile court that mother had been diagnosed with depression and 20 months after the court assumed jurisdiction over A, DHS advised the court and mother that it sought to change the permanency plan from reunification to adoption. The court held a permanency hearing that same month.

At no time before the hearing did DHS recommend to the juvenile court that mother be ordered to begin mental health counseling for depression to achieve any expected outcome with respect to the bases for jurisdiction. DHS did not file an additional or an amended petition for jurisdiction over A to encompass mother's mental health issues. Nor did DHS seek to provide mother and the court with a revised list of services that would have required mother to ameliorate her symptoms of depression and anxiety to overcome any of the bases for jurisdiction in the judgment. At the time of the permanency hearing, the jurisdictional judgment and the bases for jurisdiction over A remained unchanged from March 2011.

Evidence presented at the permanency hearing, in part, concerned mother's mental health and whether she had focused on improving her mental health. Gillis's report was part of a marked exhibit, which the juvenile court considered. Lawrence, the assigned DHS caseworker, testified that she was assigned to the case in March 2011 and her understanding at that time was that mother needed

to address her lack of housing, lack of employment, lack of understanding related to allowing safe people around A, and "[d]epression and anxiety as well." Lawrence stated that DHS had provided mother with information for self-referral to CCBH for individual counseling, referred mother for a psychological evaluation, and provided ongoing monthly bus passes to help mother get to the visitation center and counseling. When asked what mother would need to do so that A could be returned to her care, Lawrence replied, "We would like to see her actively engaged in mental health counseling. * * * We also would like for her to have safe and stable housing that would be appropriate for [A] to be returned to, and ideally a job so she can continue to sustain safe and stable housing." Mother testified at the hearing, and DHS's cross-examination focused on mother's mental health. Mother testified that she was taking several antidepressants but had stopped going to mental health treatment and CCBH because she wanted to focus on seeking employment.

With regard to the jurisdictional issue of stable housing, Lawrence testified that DHS provided mother with shelter referral lists and phone numbers of various housing opportunities. DHS also contacted Bridges to Housing, a family shelter, but learned that it was not a housing option for mother because the waitlist was not then open. Mother had, at times, been homeless or had temporary places to stay after A was placed in DHS custody, but mother had been living in a house with friends since a prior hearing in May 2012 and had not requested any housing assistance after that. Mother admitted that her current housing was not safe for A but said that she would be willing to live in a family shelter with A. Lawrence explained that DHS would not return A to mother or offer mother a chance to go to a family shelter, which mother would presumably be eligible to receive if A was in her care, because mother has not adequately addressed her "depression and anxiety * * * that underlies the lack of housing and lack of employment." Lawrence also agreed that, if A were with mother, they would be entitled to receive "TANF" (Temporary Assistance for Needy Families) benefits and food stamps, a stable source of income.

At the end of the permanency hearing, mother moved to have jurisdiction and wardship over A dismissed because the conditions or circumstances alleged in the jurisdictional judgment no longer existed. Regarding the condition that mother lacked safe and stable housing, mother argued that, if DHS was willing to reunite A with mother, mother and A would be able to live together at a family shelter. Mother further argued that she had addressed the other conditions and circumstances in the jurisdictional judgment adequately. Mother asserted that she had not allowed father to live with or visit A and had completed the educational and counseling services provided by DHS to appreciate the risk of harm father presented to A. Mother explained that, regarding A's educational needs, she could meet those needs once she received housing through a family shelter.

The juvenile court denied mother's motion to dismiss wardship of A and changed the permanency plan to adoption. In support of its decision, the juvenile court stated:

"Well, if I go through each and every review, perm[anency] hearing, every single step of the way, *it's been the mental health piece*. And why that was not an allegation is not totally clear to me because I kind of inherited the case. But it is clear to me that *Mother understood and Mother has essentially agreed along the way that she needed mental health treatment in order to achieve safe and stable housing and to appreciate the risk of harm that she put [A] in*.

"* * * *I took judicial notice of the * * * psychological evaluation* from Dr. Kathleen Gillis. * * * And it's very apparent from Dr. Gillis'[s] report, which may be, albeit, needs to be updated since Abilify and some other things have been on board there. But Mother had some major issues concerning stress. * * *

"* * * * *

"So here we are, 14 months from Dr. Gillis'[s] report, and *my understanding is that [Mother] has made very sporadic attempts at mental health treatment, that she has not followed through with the CCBH despite the fact that she still confesses to having anxiety and other things that impair her ability to manage her daily life functions*. And by that I mean, there are some people that have major

mental illnesses and they're just out of touch with reality. It appears [Mother] is in touch with reality, knows what her limitations are, and knows that she gets overwhelmed and then she freezes up, as she puts it, and that keeps her from doing what normal people do in order to be adequate parents. *So progress has been made, but it's been made in such a small degree that it's still clear to this court that [A] cannot safely be returned.* And it's not just a matter of putting [A] there and saying okay, now you've got [A], get some TANF, get some food stamps, whatever. It's the chicken and egg sort of thing. Do you risk [A] getting back into a home that is not, at this point, appropriate for her? So I don't know how that happens.

"\* \* \* \* \*

"And furthermore, we're at the 20 month mark, and so there is a rebuttable presumption, \* \* \* it is rebuttable, that's it's been too long. And the conversation in January was at the 12 month or some mark from removal, and it really has been too long and that's why we have that rebuttable presumption. I don't believe that presumption has been rebutted given the fact that we're still not at a point—you didn't get the job."

(Emphasis added.) The juvenile court emphasized that mother had not made progress in addressing her mental health issues:

"So again, I keep coming back to the notion that this must be something else. And if it isn't the mental health piece, I don't know what it is. But that's the only opinion that I have from Dr. Gillis is that you needed intensive constant treatment for six to nine months, if not longer, and that she did not believe that you could safely parent [A] without that."

The court then stated its conclusion that the plan should change from reunification to adoption.

In the permanency judgment, the juvenile court noted that "Mother is involved in the case and has not made sufficient progress toward meeting the expectations set forth in the service agreement, letter of expectation and/or case plan, and the child cannot be safely returned to mother's care." (Emphasis omitted.) In additional findings, the juvenile court stated, "Mother's depression and anxiety are

significant and require intensive [treatment] for several months or up to 1-2 [years]. Mother has not consistently engaged in mental health [treatment]."

On appeal, mother contends that the juvenile court erred in denying her motion to dismiss jurisdiction and wardship. Mother contends that she had ameliorated all the conditions and circumstances that served as the bases for jurisdiction over A and that the juvenile court failed to limit its assessment of mother's progress to the factual bases for the court's jurisdiction identified in the jurisdictional judgment. Mother argues that the juvenile court's reliance on her mental health issues was erroneous because she was not given adequate notice that she needed to address those concerns. Citing *Dept. of Human Services v. G. E.*, 243 Or App 471, 260 P3d 516, *adh'd to as modified on recons*, 246 Or App 136, 265 P3d 53 (2011), *Dept. of Human Services v. N. M. S.*, 246 Or App 284, 266 P3d 107 (2011), and *Dept. of Human Services v. N. T.*, 247 Or App 706, 271 P3d 143 (2012), mother contends that she is entitled to a reversal. DHS responds that the juvenile court did not base its rulings on a matter extrinsic to the jurisdictional bases, because mother's mental health is "sufficiently connected to other jurisdictional facts to be fairly incorporated in them." DHS also argues that mother failed to obtain safe and stable housing suitable for both herself and A, and that her argument that she would be able to obtain suitable housing in a family shelter if A were in her care is irrelevant given our standard of review.

We begin our analysis with a brief discussion of the statutory provisions governing jurisdiction and wardship to provide context, and then focus on *G. E.*, one of the cases on which mother relies and the case that frames our analysis of whether the juvenile court correctly relied on mother's lack of progress in mental health treatment or counseling in denying her motion to dismiss wardship and in changing the permanency plan for A. The juvenile court has jurisdiction over a child who is under 18 years old and "[w]hose condition or circumstances are such as to endanger the welfare of the person or of others[.]" ORS 419B.100(1)(c). In a petition alleging jurisdiction, DHS "must set forth in ordinary and concise language * * * the facts that bring the child within the jurisdiction of the court, *including sufficient information*

*to put the parties on notice of the issues in the proceeding.*" ORS 419B.809(4)(b) (emphasis added). The court determines whether the facts alleged in the petition, if proved, are sufficient to establish jurisdiction. ORS 419B.100. The court, on its own motion or a motion by an interested party, may amend the petition; however, "[i]f the amendment results in a substantial departure from the facts originally alleged, the court shall grant such continuance as the interests of justice may require." ORS 419B.809(6).

In *G. E.*, we addressed whether a parent was given adequate notice of the factual bases on which the court continued jurisdiction and wardship. In that case, the mother argued that she had ameliorated all the circumstances in the jurisdictional judgment, namely, that the mother "needed to find safe housing where dangerous people did not live or visit and that was not below community standards of sanitation, and she needed to participate in recommended substance abuse treatment." 243 Or App at 482. Noting that "[i]t is axiomatic" that "a juvenile court may not continue a wardship based on facts that have never been alleged in a jurisdictional petition," *id.* at 479 (citing ORS 419B.809(4)(b)), we concluded that the mother lacked adequate notice that her failure to address newly specified safety concerns (related to her inattention when with the child) would allow the court to continue jurisdiction and wardship. *Id.* at 483.

Juvenile courts are authorized to disregard errors or defects in petitions or other documents or proceedings only when the error or defect "does not affect the substantial rights of the adverse party." ORS 419B.857(2). Under the test articulated in *G. E.*, to avoid affecting the substantial rights of a parent, a juvenile court cannot base its jurisdictional decision on facts that depart from the petition or jurisdictional judgment when neither the petition nor the jurisdictional judgment would put a reasonable parent on notice of what the parent must do to prevent the state from asserting or continuing jurisdiction over the child. *Id.* at 481. In *N. M. S.*, 246 Or App at 300, we applied the reasoning in *G. E.* in the context of a change to a permanency plan and concluded that, if a juvenile court relies on a parental condition or characteristic that is not "one that fairly can be implied from the facts found in the jurisdictional judgment,

then it is outside the scope of the court's jurisdiction, and that deficit cannot be remedied by claims of 'actual notice' through case plans, or as the state suggests in this case, letters of expectation." *See also N. T.*, 247 Or App at 717-18 (reversing judgments changing permanency plans that were based, in part, on facts related to the father's conduct not explicitly stated in or fairly implied by the jurisdictional judgment). Thus, we examine the bases for the juvenile court's decisions and the jurisdictional judgment and determine whether the judgment would put a reasonable parent on notice that those bases would be used to continue jurisdiction over the child and to change the permanency plan for a child.

In this case, DHS implicitly acknowledged in its brief that, at least in part, the juvenile court based its decision to change the permanency plan and to deny mother's motion to dismiss jurisdiction because of mother's failure to make adequate progress toward ameliorating her depression and anxiety. At oral argument, DHS suggested that the court had relied on express jurisdictional bases and not on mother's mental health as a basis for its decisions. But, that view is contradicted by the court's explanation of its decision and by the findings in the judgment itself. The juvenile court repeatedly referred to mother's lack of progress in addressing "the mental health piece," noting that mother had failed to follow through with individual counseling even though she was aware of her depression and anxiety issues. In the judgment, the court found that "[m]other's depression and anxiety are significant and require intensive [treatment] for several months or up to 1-2 [years]. Mother has not consistently engaged in mental health [treatment]." Accordingly, we agree with mother that the juvenile court based its decisions in significant part on mother's mental health and failure to consistently engage in mental health treatment.

The jurisdictional judgment stated four conditions and circumstances sufficient for jurisdiction as to mother: (1) mother allowed father, a registered sex offender to live with her and A, which places A at risk of harm; (2) mother is in need of education and counseling to appreciate the risk of harm father presents to A and to learn how to protect A

from father; (3) mother lacks safe and stable housing; and (4) mother failed to meet the educational needs of A. None of them identifies mother's depression, anxiety, or mental health generally as a condition that endangered A. As to that condition, our determination therefore reduces to whether the jurisdictional judgment fairly implies that mother's mental health was a condition or circumstance that would justify continued jurisdiction.

Mother argues that the adjudicated grounds for jurisdiction in the judgment did not put her and would not have put a reasonable parent on notice that her depression and anxiety would warrant the court's continuation of jurisdiction and wardship over A. In response, DHS contends that mother was aware that her mental health issues related to her inability to obtain safe and stable housing and that mother's depression and anxiety are the reasons that she had not been able to find safe and stable housing and employment during the 20 months after the court assumed jurisdiction over A.[1] DHS points to its August 2011 report to the court, a year before the permanency hearing, in which DHS identified the need for mother to obtain mental health treatment. Based on that report, and other reports to the court, DHS argues that mother was on notice that she had to address her mental health problems for A to be returned to her care.

We agree with mother that she was not given adequate notice that her progress toward obtaining safe and stable housing could be measured by her progress in addressing her mental health issues. Initially, we reject DHS's argument that mother, regardless of the jurisdictional judgment, had actual notice and that is sufficient. *N. M. S.*, 246 Or App at 300.

Relying on *Dept. of Human Services v. M. M. B.*, 253 Or App 431, 440, 290 P3d 891 (2012), *rev den*, 253 Or 280 (2013), DHS also asserts that subsequent reports to the court indicated that mother needed to address her depression and anxiety issues, because those issues "play[ed] into [her]

---

[1] That contention is similar to the juvenile court's conclusion that mother needed "mental health treatment in order to achieve safe and stable housing" and that mother had actual notice of that fact.

lack of follow through in both the areas of employment and housing," and constituted sufficient notice to mother. However, those reports are insufficient to provide a parent with adequate notice. As we held in *G. E.*, only "the petition or the jurisdictional judgment" can provide a parent with adequate notice. 243 Or App at 481. DHS cannot rely on reports to the court to overcome the limits of what is contained in the jurisdictional judgment, *N. M. S.*, 246 Or App at 300, and DHS's reliance on *M. M. B.* to support that contention is misplaced.

In *M. M. B.*, we held that, when the juvenile court ordered DHS and the parent to enter into and to abide by a written action agreement and the court attached that document to the jurisdictional judgment, the parent was on notice that her progress could be measured based on the action agreement. 253 Or App at 440. The action agreement listed safety threats to the child and changes in cognitive, behavioral, or emotional protective capacities the parent had to make and demonstrate to increase her ability to keep the child safe in relation to those threats. *Id.* at 434. Although the parent argued that she was not on notice that her progress could be measured by whether her son observed a change in her behavior, the action agreement specifically stated otherwise. The parent had agreed that she understood that the changes she had to make in her behavior "'must be noticed over time by significant others, *including [her] child(ren)*, [her] caseworker, and other professionals.'" *Id.* at 435 (emphasis added). The action agreement was specific and put the parent on notice of exactly how the court would determine her progress toward addressing the bases for jurisdiction in the judgment.

This case is distinguishable from *M. M. B.* First, DHS relies on periodic reports to the court, not on any documents attached to the jurisdictional judgment, to support its argument that mother was given adequate notice that she needed to address her depression and anxiety issues. Second, even if DHS had relied on the Services Requested form that was in fact attached to the jurisdictional judgment, we would conclude that it did not adequately direct mother to ameliorate

her symptoms of depression and anxiety. The form alerted mother to participate in a psychological evaluation, which she completed, and to attend individual counseling, which she did. With regard to both of those services, the form included a handwritten notation stating, "Follow all recommendations," but unlike the action agreement in *M. M. B.*, which stated the specific problems that the parent needed to address, such as her violent or impulsive behavior and her negative perceptions of her child, the services for those problems, and how the mother's progress in addressing her problems would be evaluated, in this case, the Services Requested form is not specific. It is unclear from the Services Requested form why mother needed to attend individual counseling. Based on the jurisdictional judgment and Gillis's understanding of why mother was required to undergo a psychological evaluation (her problem "keeping [A] safe from unsafe adults"), it may well be that mother was directed to attend counseling specifically *to appreciate the risk of harm father presented to A* and not to address depression and anxiety. There is no dispute that she has addressed that significant problem as identified in the jurisdictional judgment. DHS neither recommended to the court that mother be ordered to begin mental health treatment for depression and anxiety, nor revised its Services Requested form to include individual counseling for mother's depression and anxiety issues and obtained its incorporation in a judgment. Mother was not given adequate notice from the jurisdictional judgment, or from the Services Requested document incorporated in the judgment, that her failure to address her mental health issues could be a basis for the court to continue jurisdiction over A.

At the time of the combined hearing, mother had addressed concerns that she would not protect A from father, a sex offender. In addition, A was in school, and mother pointed out that, if A were returned to her, A would attend an appropriate school. Therefore, the parties focus on the lack of "safe and stable housing" as an alternative potential basis for continuing jurisdiction and for the change in the permanency plan. In DHS's view, that was a separate and proper ground for the juvenile court to continue jurisdiction

over A. Mother argues that she should not be penalized for her lack of housing, because DHS improperly opposed A's return to mother based on mental health grounds, and mother would be able to obtain safe family shelter housing, but only if A is permitted to return to her. The juvenile court recognized that the availability of housing in a family shelter was a "chicken and egg" problem, *i.e.*, because A was not returned to mother, mother could not obtain housing in a family shelter.

Because the court based its decision to continue jurisdiction, in large part, on mother's mental health, a fact extrinsic to the jurisdictional judgment, and because it is unclear whether the court would have reached the same conclusion—that mother failed to find safe and stable housing—without considering mother's mental health issues, we cannot conclude that the court's error was harmless. *See N. T.*, 247 Or App at 718 (concluding that, "because the court did not indicate that mother's and father's lack of progress in addressing their substance abuse, mental health, and housing issues * * * was independently sufficient to warrant changing the plans for the children to adoption," the error was not harmless). For that reason, we reverse the court's denial of mother's motion to dismiss and remand for the court to reconsider mother's motion without reliance on those extrinsic facts.

In addition, the court's decision to change the permanency plan from reunification to adoption was similarly based, in large part, on mother's mental health issues. In the permanency judgment, the court determined that mother had not made sufficient progress in meeting the expectations in the "services agreement" letter and that her "depression and anxiety are significant." Again, on this record, we are unable to determine whether the court would have reached the same conclusion as to mother's progress based solely on the permissible jurisdictional bases and without considering mother's mental health issues. *See N. M. S.*, 246 Or App at 297 (noting that, "if the facts have been determined to be insufficient to support continued jurisdiction, the court lacks authority to act, let alone

decide that adoption is an appropriate plan for a child"). Accordingly, we reverse and remand the court's permanency judgment.

Reversed and remanded.