Argued and submitted March 15, reversed and remanded June 15, appellant's petition for reconsideration filed July 15 allowed by opinion October 19, 2011
See 246 Or App 136, 265 P3d 53 (2011)

In the Matter of N. E.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

G. E.,
*Appellant.*

Douglas County Circuit Court
0700557;
Petition Number 08JU066;
A146271

260 P3d 516

Mary Shannon Storey, Senior Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Appellate Division, Office of Public Defense Services.

Stacey RJ Guise, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

SCHUMAN, P. J.

**SCHUMAN, P. J.**

Mother appeals from a judgment of the juvenile court denying her motion to dismiss jurisdiction and wardship over her daughter N, along with the court's decision to change the permanency plan from reunification to adoption. Mother raises several assignments of error, principally arguing that she ameliorated all of the facts on which the court had originally based its judgment of jurisdiction and, contrary to settled law, denied her motion on the basis of facts that were extrinsic to that judgment. That is a legal question that we review for errors of law. Mother also challenges several factual determinations and asks that we exercise our discretion to review them *de novo*. We decline to do so, as we conclude that this is not an exceptional case. ORAP 5.40(8)(c). The factual determinations are supported by evidence in the record; we therefore affirm on the assignments of error involving those determinations. On the legal issues, we reverse and remand.

In November 2007, the child, who was then seven months old, was removed from mother's home under circumstances that presented a risk to her safety. The jurisdictional petition, filed on December 17, 2007, alleged:

"Said above-named child is in need of the services of the Court and a child caring agency, to Wit: Department of Human Services for Douglas County, in that said child's condition and circumstances are such as to endanger the welfare of said child or of others. Further, said parent having custody of said child has failed to provide said child with the care, guidance and protection necessary for the physical mental or emotional well-being of said child to wit:

"a) Child, and mother live with child's maternal grandmother, [grandmother's boyfriend and grandmother's son, age 16].

"b) On November 17, 2007, an incident occurred while [grandmother and her boyfriend] were under the influence of alcohol, and [grandmother's son] threatened all of the adults with a shotgun during this incident. The child was present and in the line of fire, placing her at risk of harm.

"c) The home was below minimum community standards with a strong odor of urine and animal feces. The

room where child sleeps had animal feces and dirty diapers on the floor and baby bottles with old, separated, curdled formula.

"d)  Mother has no other resources for safe housing for herself and the child.

"e)  Mother has a history of substance abuse which could impact her ability to safely parent. She agrees to participate in recommended treatment.

"f)  There is no legal father identified."

In April 2008, mother, who was then 18 and unmarried, admitted all of the allegations, and the court entered a judgment based on them. N was placed in foster care. Mother moved to Safe Haven, a shelter for young mothers that provides a structured environment to allow parents to gain needed skills. Mother began and completed parenting classes, as well as drug and alcohol treatment.

N was returned to mother at Safe Haven in June 2008, but was removed again in November 2008, based on mother's neglect and mother's expressed concerns that she was not bonded to N, that she did not want to stay any longer at Safe Haven, and that she did not want to parent N. At that time, mother admitted to being overwhelmed, depressed, and doubtful of her ability to parent. She said that she was considering giving N up for adoption to the current foster family. Mother told many people that she had intentionally neglected N during this period so that N would be removed from her custody, which would result in mother being unable to remain at Safe Haven, so she could then move in with her boyfriend. N was returned to her original foster family, with whom she remains and which has been approved as an adoptive placement for her.

After N was removed from mother's custody a second time, mother continued to be offered services and treatment; for a while she declined to participate. Mother moved out of Safe Haven and for a short time lived with the parents of her then-boyfriend, to whom she is now married and with whom she has had a second child, L.

In February 2009, mother moved back into Safe Haven, and through the spring of 2009, mother vacillated

between wanting to regain custody of N and releasing her for adoption. Mother resumed supervised visits with N. In March, mother became pregnant with L. In April 2009, mother had a psychological assessment; the evaluator's opinion was that, despite significant intervention, there had been no improvement in mother's parenting skills—specifically her attentiveness to N—and recommended against reunification. In June 2009, DHS moved to a plan of adoption.

At a permanency hearing in June 2009, a DHS worker testified that mother's parenting skills had not improved. Mother's counselor testified that he believed that mother had a mild form of depression. Mother testified that she wanted another chance to reengage in services and believed that she could successfully parent N if given six months to work on her parenting skills. She testified that she believed that her attitude had improved and that she now realized she had a substance abuse problem and needed further treatment.

The court ruled on June 30, 2009, that the permanency plan for N was changed from reunification to adoption. Mother appealed, assigning error to the juvenile court's failure to make the findings necessary to make a change in the permanency plan to adoption. While that appeal was pending, mother continued to have visits with N of increasing length through the summer, but DHS workers reported that they did not notice any improvement in mother's engagement with N. Also while the appeal was pending, on October 30, 2009, mother gave birth to L. The state filed a petition asserting jurisdiction over L, but it was dismissed.

Notwithstanding the pending appeal, the juvenile court in January 2010 issued a permanency judgment again specifying that the permanency plan was adoption and making the findings that the June 2009 judgment lacked, finding specifically that none of the circumstances in ORS 419B.498(2) applied. *See State ex rel Juv. Dept. v. J. F. B.*, 230 Or App 106, 114, 214 P3d 827 (2009) (when a court determines that the permanency plan for a ward should be adoption, the order "shall include," among other things, the court's determination of whether one of the circumstances in ORS 419B.498(2) is applicable).

On February 3, 2010, this court reversed and remanded the permanency judgment of June 2009, on the ground that the trial court had erred by not including in the judgment the determination required by ORS 419B.476(5)(d).[1] *Dept. of Human Services v. G. E.*, 233 Or App 618, 619, 227 P3d 1180 (2010).

Mother then moved to dismiss the juvenile court's wardship over N, ORS 419B.328(2)(a), and in the alternative requested a new permanency hearing. Mother subsequently withdrew her request for a permanency hearing, but the juvenile court scheduled one on the child's motion; it also considered mother's motion to dismiss. Mother contended that the case should be dismissed because the conditions asserted in the December 2007 petition had been ameliorated: She was no longer living in substandard housing under circumstances that posed a risk to N's safety, and she had completed treatment for substance abuse.

After a combined hearing on the motion to dismiss and permanency, held in June 2010, the juvenile court denied mother's motion to dismiss, once again ordered the permanency plan of adoption, and directed that the state file a petition to terminate mother's parental rights to N within 60 days. The court wrote an extensive opinion describing the services that had been provided to mother since N had been removed in November 2007, as well as mother's lack of compliance, progress, forthrightness, and credibility. The court rejected mother's contention that the circumstances in the original petition had been ameliorated.

In addressing mother's motion to dismiss, the court explained that "the issues in the petition and other issues prevent the Court from dismissing the petition." The court found that, although mother no longer lived in substandard housing, her current housing situation with her husband's parents was not appropriate for N, because the sleeping arrangement would require N to share a very small bedroom with mother, her husband, and her half-brother, a space that

---

[1] ORS 419B.476(5)(d) requires that a permanency hearing order determining that the permanent plan be adoption must include "whether one of the circumstances in ORS 419B.498(2) is applicable." ORS 419B.498(2), in turn, lists factors that negate the possibility of terminating a person's parental rights.

mother herself had said was not adequate. The juvenile court found further that mother's substance abuse issues had not been fully addressed. The court based that finding on mother's lack of honesty regarding her level of consumption and her failure to acknowledge that she continued to have a substance abuse problem, resulting in treatment ending prematurely. In addition, the court found that mother was not credible and explained that, despite the many services that had been provided to her, she had not developed the skills necessary to understand the safety concerns that had prompted the removal of N from her care. The court expressly found that mother did not appreciate safety risks and was not able to keep the child safe.

In considering permanency, the court explained:

> "Despite some improvement in the condition of mother, there have not been changes in the overall condition of mother. [Mother's caseworker] summed up the situation in a few words when she said that the mother doesn't outright refuse to participate in services, she just doesn't get it. The 'it' being the safe relationship of her daughter and making changes necessary to have that happen."

The court determined that "it is not possible at this time to return the child safely to the mother within the provisions of ORS 419B.476," and that, in the light of the services that had been provided and mother's lack of progress, the permanency plan of adoption was best for the child's health and safety.

The court rejected mother's contention that the state had not made "reasonable efforts" to return the child safely home, ORS 419B.340(1), finding:

> "In the Court's view, based on the evidence here, the agency has gone to extraordinary lengths in attempts to strengthen the parenting skills of the mother. The child was returned to the mother for a period of time. Over two complete sessions of parenting skills training classes have been provided without lasting results. Mentoring and coaching services have been provided without lasting change. Mental health evaluations and counseling have been provided with a failure of the mother to be honest with the Court and treatment providers."

The permanency hearing judgment included the following findings:

> "It is necessary to continue the child in substitute care because the mother has not made sufficient progress toward return. Mother does not have safe and stable housing for this child. The mother has not eliminated the barriers for return of the child. The mother's depression and other mental health issues that caused her to neglect her child by maintaining an unsafe home and a home below minimum standards at the first removal and still present when the child was removed the second time have not been adequately addressed."

The judgment concluded, "[G]iving paramount consideration to the child's health and safety, the child's mother has not made sufficient progress to make it possible for the child to safely return home."

We first address mother's contention that the juvenile court erred in denying her motion to dismiss the wardship. We review that denial for errors of law. *See State v. A. L. M.*, 232 Or App 13, 18, 220 P3d 449 (2009) (applying standard). We are bound by the juvenile court's findings of historical fact as long as there is any evidence to support them. *State v. S. T. S.*, 236 Or App 646, 654-55, 238 P3d 53 (2010); *Dept. of Human Services v. C. Z.*, 236 Or App 436, 442, 236 P3d 791 (2010) (explaining court's standard of review under ORS 19.415(3)(b)).

Mother's first argument on appeal in support of her motion to dismiss is that the factual circumstances found in the jurisdictional judgment have been ameliorated and that the court based its decision on different facts. She no longer lives in the home of child's grandmother, she does not live with or associate with any shotgun-wielding persons, her home is no longer below community standards of cleanliness, and she no longer needs to participate in substance abuse treatment. The court's denial of her motion to dismiss, she contends, was based on entirely new facts. The department, for its part, argues that the court's denial was based on the unchanging facts that mother's living situation is unsafe for N and mother still does not provide N with the care, guidance, and protection that N needs. As we explain below, we

find that the court may have based its decision on some facts that are extrinsic to the jurisdictional judgment. For that reason, we must reverse and remand for clarification and possible amendment of the original jurisdictional judgment.

"It is axiomatic," we have held, "that a juvenile court may not continue a wardship 'if the jurisdictional facts on which it is based have ceased to exist.'" *A. L. M.*, 232 Or App at 16 (quoting *State ex rel Juv. Dept. v. Gates*, 96 Or App 365, 372, 774 P2d 484, *rev den*, 308 Or 315 (1989)). It is equally axiomatic that a juvenile court may not continue a wardship based on facts that have never been alleged in a jurisdictional petition. *See* ORS 419B.809(4)(b) (dependency petition must "contain the facts that bring the child within the jurisdiction of the court, including sufficient information to put the parties on notice of the issues in the proceeding"). These precepts, however, are the beginning of our inquiry and not the end. That is so, because "facts" come in many levels of specificity. The department urges us to apply a very general level, focusing on the introductory material that repeats or paraphrases the statutory standards set out in ORS 419B.100(1)—for example, the child's condition and circumstances are such as to endanger her welfare, or the custodial parent has failed to provide the child with the care, guidance, and protection necessary for her physical, mental, or emotional well-being. Mother, in essence, urges us to approach the inquiry at a highly specific level, focusing on the "to wit" facts spelled out in "a" through "f" of the jurisdictional petition—for example, the child was present in his grandmother's apartment when grandmother's son threatened the adults with a shotgun, with child in the line of fire; or the home was below community standards due to strong odors, animal feces, and dirty diapers.

Mother's approach presents insurmountable practical difficulties. It presumes that the court's authority to assert jurisdiction is based on specific facts and not on the conditions or characteristics that those facts demonstrate or exemplify; it mistakes the symptoms for the disease. For example, it would mean that the court could not continue jurisdiction over N even if the department established that, although the shotgun-wielding person had been evicted, he had been replaced by a different shotgun-wielding person or

by a wanted violent felon. The court could not continue jurisdiction on the basis that, although mother no longer lives in grandmother's house, she now lives down the block with armed methamphetamine cooks. Mother acknowledges such possibilities, but contends that the proper way for the state to deal with them is to submit an amended petition. *See* ORS 419B.809(6) (court on own motion or motion of interested party may direct that the petition be amended at any time). But human relationships, circumstances, and actions are never static; they change constantly, sometimes daily. We cannot imagine that the legislature intended endless sequential motions to amend, and the necessarily ensuing endless delays, every time a minor circumstance changes.

On the other hand, the department's approach has insurmountable problems of its own. Some of the statutory "factual" grounds for the assertion of jurisdiction—a child's "condition or circumstances are such as to endanger the welfare of the person or of others," ORS 419B.100(1)(c), for example—are so elastic or formless that the department could start the process based on one set of events or conditions (for example, the child is in a home with multiple fire hazards) and ultimately litigate the case based on entirely unrelated ones (parent associates with drug dealers), thereby depriving the parent of constitutionally adequate notice as to what, exactly, he or she is supposed to be doing in order to terminate the authority of the state to act as the child's surrogate parent.

ORS 419B.857 informs the proper accommodation of the state's duty to efficiently determine an at-risk child's fate and a parent's right to notice—without which the parent can neither prepare a defense nor properly address the circumstances or conditions that, according to the state, justify displacing parental authority. That statute provides:

"(1)   All petitions, answers, motions and other papers must be liberally construed with a view of substantial justice between the parties.

"(2)   In every stage of an action, the court shall disregard an error or defect in a petition, answer, motion, other paper or proceeding that does not affect the substantial rights of the adverse party."

This statute supports the inference that the legislature recognizes two situations in which the facts on which the juvenile court bases jurisdiction differ from facts in the original petition or jurisdictional judgment: situations in which the difference "does not affect the substantial rights" of the parent, and situations in which it does. ORS 419B.857(2). In the second situation, in order to preserve the substantial rights of the parent, the court must direct that the petition be amended and grant such continuance as the interests of justice may require. *See* ORS 419B.809(6) (allowing amendment of petition); ORS 419B.923 (allowing amendment of judgment). Typically, such a continuance will allow the parent adequate opportunity to defend against the new or unproven allegation, or opportunity to ameliorate it.[2]

The proven facts depart from the petition so as to substantially affect a parent's rights if a reasonable parent would not have had notice from the petition or the jurisdictional judgment as to what he or she must do in order to prevent the state from assuming or continuing jurisdiction over the child. Thus, for example, if the petition alleges that the child's circumstances endanger her welfare because the child is living in a home where a fellow occupant pointed a loaded gun at her, a reasonable parent would know that the state can assert jurisdiction if it proves by a preponderance of the evidence that the child is living in a different home where a different occupant exposes her to dangerous weapons or inherently dangerous substances. A reasonable parent could infer from the allegation in the petition that the state is concerned with her ability or willingness to establish a home where the child is safe from people who engage in dangerous conduct.

Applying these precepts to the present case, we begin by repeating the allegations in the dependency petition, all of which were admitted and proved.

"Said above-named child is in need of the services of the Court and a child caring agency, to Wit: Department of

---

[2] We acknowledge the argument that, in some circumstances, the parent will have received actual notice of the department's intention to continue jurisdiction based on facts extrinsic to the jurisdictional judgment. This case does not present that situation, and we do not reach it.

Human Services for Douglas County, in that said child's condition and circumstances are such as to endanger the welfare of said child or of others. Further, said parent having custody of said child has failed to provide said child with the care, guidance and protection necessary for the physical mental or emotional well-being of said child to wit:

"a)  Child, and mother live with child's maternal grandmother, [grandmother's boyfriend and grandmother's son, age 16].

"b)  On November 17, 2007, an incident occurred while [grandmother and her boyfriend] were under the influence of alcohol, and [grandmother's son] threatened all of the adults with a shotgun during this incident. The child was present and in the line of fire, placing her at risk of harm.

"c)  The home was below minimum community standards with a strong odor of urine and animal feces. The room where child sleeps had animal feces and dirty diapers on the floor and baby bottles with old, separated, curdled formula.

"d)  Mother has no other resources for safe housing for herself and the child.

"e)  Mother has a history of substance abuse which could impact her ability to safely parent. She agrees to participate in recommended treatment.

"f)  There is no legal father identified."

As noted, mother admitted the allegations in 2009. A fair reading of the judgment should have alerted mother that she needed to find safe housing where dangerous people did not live or visit and that was not below community standards of sanitation, and that she needed to participate in recommended substance abuse treatment.

The judgment denying mother's motion to dismiss wardship and establishing adoption as the permanency plan is based on the following findings of fact:

"[Mother] has not completed drug and alcohol treatment. She does not have safe and stable housing which would allow for the placement of the child [with her]. She has not made changes that allow for her to provide the child with a safe home. She has not made the changes that allow

for her to provide the child with a home that meets minimum community standards. She has not made changes that address her mental health problems that caused her to neglect her child."

The judgment expressly refers to and incorporates by reference a detailed "Memorandum Opinion," from which we learn that the safety concerns consist of the following:

- Mother pinched child when attempting to secure her seat belt.

- She failed to fasten the child seat securely to the car.

- She failed adequately to keep child from "getting too near stairs."

- She failed to prevent child from "getting into the garbage."

- She failed to prevent child from "getting into the litter box."

- She failed to keep the child from "possibly spoiled food."

- She allowed child to attend school with wet diapers, diaper rash, and (at times) no shoes.

On this record, we conclude that based on the allegations of the petition and the jurisdictional judgment, mother should have been on notice that she needed to follow through with recommended substance abuse treatment, and she did not do so. We also conclude, however, that mother had no reason to know that failure to address the newly specified safety concerns could lead to continued jurisdiction. Those concerns are different in kind from the concerns in the original jurisdictional judgment. In the original judgment, mother was faulted for recklessly exposing N to deadly weapons; here, mother is faulted for inattention. The facts on which the trial court based its permanency judgment are, indeed, extrinsic to the facts (as we have defined that term) relied on in the jurisdictional judgment.

The court relied on "the issues in the petition and other issues." We are unable on this record to determine the role that the extrinsic facts played in the court's determination, nor can we foresee whether the department will seek to

modify the original jurisdictional judgment. ORS 419B.923. We therefore reverse and remand.[3]

Reversed and remanded.

---

[3] Because the issue may recur on remand, we address, and reject, mother's argument that the state did not make reasonable efforts to achieve reunification.