Argued and submitted March 4, reversed and remanded May 15, 2013

In the Matter of N. S., aka N. D. S.-T.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*
*and*

S. D.-V.,
*Respondent,*

*v.*

A. R. S.
and N. S.,
*Appellants.*

Washington County Circuit Court
J070280;
Petition Number 02J070280;
A151729

303 P3d 963

Shannon Storey, Senior Deputy Public Defender, argued the cause for appellant A. R. S. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Megan L. Jacquot argued the cause and filed the brief for appellant N. S.

Cecil A. Reniche-Smith, Assistant Attorney General, argued the cause for respondent Department of Human Services. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Erin Galli argued the cause for respondent S. D.-V. With her on the brief was Chilton & Galli, LLC.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Duncan, Judge.

DUNCAN, J.

**DUNCAN, J.**

This is a juvenile dependency case in which mother and child (collectively, appellants) separately appeal a permanency judgment that denied their motions to dismiss jurisdiction over child and continued the plan of "return to parent." The juvenile court determined that mother (who lives in Oregon) had not made sufficient progress to enable child to safely return to her care, but father (who now lives in Mexico) had made the necessary progress.[1] Thus, although the permanency judgment does not explicitly order child to be placed with father in Mexico, it contemplates that the "return to parent" plan for child is currently "return to father." Appellants each assert that the court erred in (1) denying their motions to dismiss jurisdiction; (2) ordering mother to live independently as a prerequisite for reunification; (3) ruling that the efforts of the Department of Human Services (DHS) to assist mother in ameliorating the bases for jurisdiction were reasonable; (4) ruling that mother's progress toward that goal was insufficient to allow for the safe return of child to her care; (5) ordering DHS to place child with father; and (6) overruling child's objection to being placed outside the United States. Child further asserts that the court erred in "determining that [child's] best interest required that wardship continue despite its determination that he would need to be removed from the only home and family he could remember and placed in a strange country, home and family." We conclude that the court erred in relying on a circumstance—specifically, mother's alleged personality disorder—that was not pleaded or proved as a basis for dependency jurisdiction when it denied appellants' motions to dismiss and determined that mother had made insufficient progress toward reunification. Accordingly, we reverse and remand the judgment on that basis and do not address the parties' other arguments.

Appellants request that we exercise our discretion under ORS 19.415(3)(b) to review this case *de novo.* They assert that such review is warranted because, notwithstanding

---

[1] Although the court determined that "[c]hild can be safely returned to Father's care," it did not dismiss wardship over child, presumably because, in the absence of the court's dependency jurisdiction, mother, not father, would have legal custody of child.

our reversal of an earlier permanency judgment on the basis that the court had erroneously concluded that mother was required to demonstrate that she could parent child independently, *Dept. of Human Services v. A. R. S.*, 249 Or App 603, 605, 278 P3d 91 (2012) (*A. R. S. I*), the court again applied that requirement in assessing mother's progress toward reunification and denying appellants' motions to dismiss. In addition, they contend that *de novo* review is warranted "because the majority of the court's factual findings are either (1) wholly without evidentiary support in the record; (2) flatly contradicted by the evidence in the record; or (3) statements of historical facts that are mischaracterized as the current circumstances." DHS and father (collectively, respondents) disagree, contending that this is not an "exceptional case" warranting *de novo* review, *see* ORAP 5.40(8)(c), among other reasons, because (1) appellants' "chief complaints" are legal rather than factual; (2) in amending the standard of review to be applied in these types of cases, the legislature did not intend that simple evidentiary disputes would trigger *de novo* review; and (3) the court made extensive factual findings that rely, in significant part, on the court's credibility determinations, which would be entitled to considerable weight on *de novo* review.

Because we resolve this appeal based on a purely legal question—one that is not dependent on any disputed factual findings of the trial court—we decline to exercise our discretion to review the case *de novo*. We therefore review the juvenile court's legal conclusions for legal error. *State v. S. T. S.*, 236 Or App 646, 655, 238 P3d 53 (2010).

We recite only those historical and procedural facts that are necessary to give context to our discussion of the dispositive legal issue. Those facts are taken from the record and are undisputed.

DHS first filed a dependency petition with respect to child on July 24, 2007, four days after his birth. In a shelter/ preliminary hearing order, the juvenile court granted DHS temporary custody of child and approved placement of child with mother in child's maternal grandmother's (foster mother)

home.[2] Jurisdiction was established in September 2007; as to mother, it was based on mother's substance abuse problem, exposure of child to controlled substances while pregnant, and relinquishment of parental rights to her two older children. Jurisdiction as to father was based on his substance abuse, his status as legal father, and because his parenting capacity was "unknown." Child remained placed with mother in foster mother's home. In October 2008, the juvenile court ruled that mother had made sufficient progress to ensure child's safe return to her and terminated its wardship of child.[3] A year later, however, after mother left child with foster mother for five days without telling her when she would return, foster mother called DHS, and DHS again took protective custody of child. In October 2009, DHS filed a new dependency petition. The juvenile court entered new jurisdictional judgments over child in November 2009 (relating to father) and February 2010 (relating to mother). Child has lived with foster mother ever since.

As it relates to mother,[4] the court established dependency jurisdiction over child based on the following facts:

_____

[2] Foster mother is also the adoptive parent of mother's two older children, child's siblings, over whom mother previously relinquished her parental rights.

[3] In the same month, in a separate, domestic relations case filed in the circuit court (which was consolidated with the juvenile dependency proceeding below, *see* ORS 419B.806), the court granted mother sole custody of child and father six hours per week supervised parenting time. In December 2009, father moved to modify that judgment and change custody of child to him; mother filed a competing motion. Subsequently, mother reported father to Immigration and Customs Enforcement, and father voluntarily returned to Mexico in December 2010. Since that time, father has cooperated with DIF, the equivalent of DHS in Mexico, and has completed a home study, prepared a room for child in the home he lives in in Mexico City with his extended family, and kept in contact with child through phone calls and "Skype." In August 2011, the court granted foster mother's motion to intervene in the domestic relations case. Foster mother requests in that case that custody of child be changed to her, stating in her accompanying affidavit, "The legal parents are unable or unwilling to care adequately for the child."

[4] The operative jurisdictional bases regarding father are as follows:

"G. [Father] is the legal father of said child due to a Joint Voluntary Acknowledgment of Paternity dated November 14th, 2007. He is on said child's birth certificate.

"H. The father has been unable to establish a relationship with said child and desires a relationship as well as custody of said child and requires assistance from [DHS] in establishing a relationship with said child."

"A. The mother has had residential instability since July of 2009, which impairs her ability to provide for said child.

"B. The mother has a history of substance abuse, which if left untreated impairs her ability to care for said child. She provided a UA on October 8, 2009 that failed to register on the temperature test strip and tested positive for amphetamines/methamphetamines on a subsequent UA on the same date.

"C. The mother has a history of leaving said child in the care of her mother without making appropriate plans for said child's ongoing care and supervision. This occurred frequently during September of 2009 and from October 2nd to October 7th, 2009. The mother knew that said child was safe with her mother.

"D. Said child had a head injury in approximately September of 2009 which required stapling. The mother did not return said child to the doctor to have the staples removed. The late removal did not permanently adversely effect said child.

"E. The mother had chosen violent and/or unsafe partners, which places said child at risk of harm. The mother's current husband is incarcerated until February of 2011 for Methamphetamine related crimes.

"F. The mother voluntarily relinquished her parental right to two (2) other children."

The permanency hearing that resulted in the judgment at issue in this appeal took place on April 11-12, April 25, May 10-11, and June 6, 2012.[5] At the conclusion of the hearing, the court denied appellants' motions to dismiss jurisdiction; determined that mother had not made

---

[5] Our decision in *A. R. S. I* issued on May 2, 2012, during the pendency of that hearing. In *A. R. S. I*, we held, in a *per curiam* opinion, that the court had erred, in an earlier permanency judgment involving child, in assessing mother's progress toward reunification on the legally erroneous premise that mother was required to demonstrate that she was able to parent child independently—"that is, without the assistance of child's maternal grandmother, who was child's foster placement and with whom mother (with grandmother's approval and encouragement) wanted to live[.]" 249 Or App at 605.

As noted, appellants argue in this case that the court continues to apply that incorrect premise to mother's circumstances. We express no opinion on that issue, except to note that the court's reasoning on that point, expressed in its oral ruling, is less than clear.

sufficient progress toward reunification with child, but that father had; and, consequently, ordered the permanency plan for child to "remain[ ] return to a parent." The court also ordered DHS to "take affirmative steps to affect [*sic*] placement of the child in the care of parent or request a hearing" after "no fewer than 30 days." The court found that "child has been in substitute care for 32 consecutive months" and "although child has been in a loving foster placement since his removal from a parent, the time has come for child's return to a parent when DHS can do so safely." The court subsequently entered a 14-page written judgment explaining its ruling.[6]

Mother and child appeal. As noted, among other issues, they assign error to the juvenile court's denial of their motions to dismiss jurisdiction and its determination that mother has made insufficient progress toward ameliorating the bases for jurisdiction to enable the child to be returned to her. They contend, in part, that wardship should have been dismissed because mother had adequately addressed the bases upon which jurisdiction was established and the juvenile court improperly relied on different bases—including mother's purported personality disorder—for maintaining jurisdiction. Appellants challenge the permanency judgment, in part, on the same basis, arguing that DHS failed to establish the insufficiency of mother's progress toward ameliorating the bases for jurisdiction that had been pleaded and proved. In response to those arguments, DHS disputes that the court actually relied on mother's diagnosis of a personality disorder as a basis for continuing the court's jurisdiction. Rather, in DHS's view, the court simply "referenced that condition to explain why mother had been unable to cure the conditions supporting jurisdiction, including her residential instability and lack of employment." We agree with appellants. Specifically, we conclude that the juvenile court erred in relying on mother's purported personality disorder in assessing mother's progress toward reunification and in denying appellants' motions to dismiss jurisdiction over child, and we reverse and remand for the court to reconsider those rulings.

[6] The Appellate Commissioner granted mother's motion to stay enforcement of the judgment.

A juvenile court may not continue wardship over a child or change the permanency plan for the child from reunification to adoption based on conditions or circumstances that are not explicitly stated or fairly implied by the jurisdictional judgment. *Dept. of Human Services v. G. E.*, 243 Or App 471, 260 P3d 516, *adh'd to as modified on recons*, 246 Or App 136, 265 P3d 53 (2011) (denial of motion to dismiss wardship); *Dept. of Human Services v. N. M. S.*, 246 Or App 284, 266 P3d 107 (2011) (change of permanency plan). The same standard applies when, as here, the court *continues* reunification as the permanency plan for the child. That is so because, under ORS 419B.476(2)(a), in *every* instance in which the permanency plan for the child at the time of the hearing is reunification—whether the court continues that plan following the hearing or changes it to another plan— the court is required to determine whether DHS has made "reasonable efforts" (or, if the Indian Child Welfare Act applies, "active efforts") and whether the parent has made "sufficient progress" to make it possible for the child to safely return home. And, "[t]he particular issues of parental unfitness established in the jurisdictional judgment provide the framework for the court's analysis" of those two questions. *Dept. of Human Services v. N. T.*, 247 Or App 706, 715, 271 P3d 143 (2012). "[T]hat is, both DHS's efforts and a parent's progress are evaluated by reference to the facts that formed the bases for juvenile court jurisdiction." *Id.*; *cf. Dept. of Human Services v. C. L.*, 254 Or App 203, 214, 295 P3d 72 (2012) (juvenile court did not err in considering circumstances not reflected in the jurisdictional judgment in decision to change the permanency plan for the child from "another planned permanent living arrangement" to adoption because the parent's "sufficient progress" is not part of the statutory analysis in that circumstance). Underlying the rule is the principle that

> "a petition or jurisdictional judgment must provide a parent with reasonable notice of the deficiencies that he or she must address in order to prevent continued jurisdiction: if it does not, it affects a 'substantial right' of the parent— *viz.*, the right to constitutionally adequate notice—and the petition or judgment must be amended before the court can rely on such 'extrinsic facts' in its permanency judgment."

*N. M. S.*, 246 Or App at 300; *G. E.*, 243 Or App at 481 ("The proven facts depart from the petition so as to substantially affect a parent's rights if a reasonable parent would not have had notice from the petition or jurisdictional judgment as to what he or she must do in order to prevent the state from assuming or continuing jurisdiction over the child.").

In this case, no party disputes that jurisdiction as to mother was based on six deficiencies: (1) residential instability; (2) substance abuse: (3) history of leaving child with foster mother; (4) failing to return child to the doctor to have staples removed from his head;[7] (5) choosing unsafe partners; and (6) the relinquishment of her parental rights with respect to her other two children. Instead of focusing on those concerns, however, the court improperly relied on mother's purported personality disorder—a circumstance that was never alleged or established as the basis for jurisdiction in this case—in reaching its conclusions.[8]

That legal error permeated the entirety of the court's reasoning. With respect to the permanency plan, the court concluded:

"Mother is involved in the case and has ***not*** made sufficient progress toward meeting the expectations set forth in the case plan, and the Child cannot be safely returned to Mother's care. *Mother continues to suffer from a personality disorder that affects her ability to independently parent her Child, or safely parent her Child with the foster parent who is the Child's maternal grandmother (hereafter foster parent).* Mother's continuing unemployment, residential instability, associations with unsafe persons, dysfunctional relationship with the foster parent and failure to complete inpatient or outpatient treatment requires continued legal

---

[7] Whether this allegation is broad enough to encompass a general failure by mother to adequately address child's medical needs (such as her purported failure to heed medical advice to quit smoking and remove pets in an effort to reduce child's chronic asthma symptoms) is arguable. We need not address that question, however, because—even assuming that it is, and that it is *factually* born out by the record—the court's resolution of the issue was tainted by its reliance on mother's alleged personality disorder.

[8] The parties dispute whether the record supports the court's finding that mother currently suffers from a personality disorder. However, we need not resolve that factual dispute because, even assuming there is evidence to support the court's finding, as we explain below, the court erred as a matter of law in relying on a fact that was outside the scope of the jurisdictional judgment.

custody to DHS and court wardship. Child cannot be safely [] placed with mother individually, nor safely continued with mother in foster mother's home without continued DHS intervention and support along with court oversight."

(Boldface and italics in first sentence in original; other emphasis added.) The judgment also explained:

"Mother's reliance on maternal foster parent for emotional and financial support highlights the point that *mother's personality disorder is the barrier for mother's successful long term parenting of Child without DHS and court supervision.* The characteristic of the personality disorder described by Dr. Johnson as a persistent, entrenched lifestyle of relying on dysfunctional relationships continue. Mother's criminal thinking in manipulating father's circumstances to achieve his removal in the fall of 2010 speaks to that. Mother's behavior by relying on maternal foster parent for financial and emotional support has allowed mother to remain a part of Child's life without gaining the tools to parent child safely."

(Emphasis added.) The court's oral ruling further reflects the court's reliance on mother's alleged mental health condition:

"[T]he Court finds that Mom has made insufficient progress towards reunification and that those issues raised by her psychologist persist. They expressed themselves in different ways but the essence of that Personality Disorder is it affects Mother's inability to cooperate with others in the best interest of her child. Sometimes it's reflected in her dysfunctional relationship with men. Sometimes it's reflected in her dysfunctional relationship with her mother. Sometimes it's reflected in her dysfunctional relationship with DHS. But, nevertheless, those Personality Disorders affect her ability to parent."[9]

The court similarly focused on mother's alleged emotional and mental health problems in denying the motion to dismiss wardship. The judgment concludes:

---

[9] As further indication of the court's focus on this issue, the court also commented on father's *lack* of a personality disorder. The court stated:

"In contrast, Father has successfully completed all of his services, hasn't re-offended, hasn't engaged in any behavior or conduct to interfere with placement of the child in his current placement. *Hasn't by his behavior or conduct, expressed any Personality Disorder that would convince the Court that he would be unable to meet the child's needs in the future."*

(Emphasis added.)

"Under the totality of the circumstances there is a reasonable liklihood of harm to the welfare of the child that is current and reasonably likely to be realized without continued DHS and court intervention. *Mother suffers from a personality disorder. That personality disorder has resulted in a 10 year period of residential instability and unemployment, criminal court involvement and unhealthy or unsafe personal relationships.* \* \* \*

"Poverty or residential instability alone can never be the basis for DHS or Court involvement. However, Mother's prolonged homelessness and unemployment which continues to express itself as late as June of 2012 is *behavior that reflects an untreated emotional problem that continues to pose a risk of harm to the welfare of this Child.* \* \* \*."

(Emphasis added.) Finally, in discussing the viability of mother's plan to move in with foster mother, the court found that,

"[g]iven the historical conflict between foster mother and mother, along with both foster mother and mother's lack of transparency in their sworn testimony, *the evidence is not convincing that mother's underlying personality issues can be resolved simply by allowing foster mother and mother to co-parent with an unwritten 'agreement of expectations.'*"

(Emphasis added.)

In our view, the trial court's expressed reasoning belies DHS's suggestion that the court did not use mother's mental health condition "as an independent, unadjudicated ground for jurisdiction."[10] Although we appreciate that it can be difficult to separate the conditions for jurisdiction from

---

[10] We came to the same conclusion recently in *Dept. of Human Services v. J. R. L.*, 256 Or App 437, 300 P3d 291 (2013). In that case, jurisdiction over the child was based on the mother's admissions relating to exposure of the child to risks of sexual abuse by the child's father, a lack of suitable housing, and a failure to meet the child's educational needs. *Id.* at 439. The juvenile court denied the mother's motion to dismiss wardship and approved a change in plan for the child from reunification to adoption. *Id.* at 444. On appeal, the mother argued that the court had erred in both respects because the court improperly relied on her mental health problem, which was not a basis for jurisdiction. *Id.* at 446. We agreed with the mother, concluding that it was apparent from the court's explanation of its decision and its findings that the "mother's mental health and failure to consistently engage in mental health treatment" was a significant factor in the court's decisions. *Id.* at 448. Moreover, contrary to the state's suggestion, that defect was not cured by periodic reports to the court indicating that the mother needed to address her depression and anxiety issues. *Id.* at 449-50. Accordingly, we reversed

the causes of those conditions, under the court's approach here, it would be impossible for mother to cure the conditions that formed the bases for the court's jurisdiction without first addressing her purported—and unajudicated—mental health condition. Yet, nothing in the jurisdictional judgment would have alerted mother to that proposition. In other words, if, as the court concluded, mother indeed suffers from an underlying personality disorder that is the "barrier" preventing her from reunification with child, mother is entitled to notice—and an opportunity to address—that condition. *See Dept. of Human Services v. J. R. L.*, 256 Or App 437, 449-51, 300 P3d 291 (2013); *G. E.*, 243 Or App at 481. Accordingly, we reverse and remand. *See J. R. L.*, 256 Or App at 452-53; *N. M. S.*, 246 Or App at 301 (reversing and remanding "[b]ecause the court's analysis that DHS had made reasonable efforts to reunify the family and that mother's progress toward that goal was insufficient was based, at least in part, on an erroneous understanding of the scope of the jurisdictional judgment); *N. T.*, 247 Or App at 718 (remand required where it was unclear whether the court would have reached the same conclusion in the absence of the improper allegations upon which the court was "clearly focused").

Reversed and remanded.

---

and remanded for the court to reconsider its rulings "without reliance on those extrinsic facts." *Id.* at 452.