Argued and submitted February 12, affirmed July 22, on appellant's petition for reconsideration filed August 5, allowed by opinion, September 30, 2015

See 274 Or App 186, 361 P3d 610 (2015)

In the Matter of C. M. H.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

J. C. H.,
*Appellant.*

Lane County Circuit Court
00402J;
Petition Number 00402J05;
A157495 (Control)

In the Matter of C. J. H., IV,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

J. C. H.,
*Appellant.*

Lane County Circuit Court
11551J;
Petition Number 11551J04;
A157496

In the Matter of K. D. H.,

a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

J. C. H.,
*Appellant.*

Lane County Circuit Court
11552J;
Petition Number 11552J04;
A157497

358 P3d 294

Daniel J. Casey argued the cause and filed the brief for appellant.

Shannon T. Reel, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Nakamoto, Presiding Judge, and Egan, Judge, and Wilson, Senior Judge.

EGAN, J.

## EGAN, J.

In this consolidated termination of parental rights (TPR) case, father appeals a judgment terminating his parental rights to three of his four children.[1] In a single assignment of error, father asserts that the record does not provide a basis for termination of his parental rights by clear and convincing evidence. Father argues that, on *de novo* review, ORS 19.415(3)(a), we should conclude that the juvenile court erred in terminating his parental rights, because the Department of Human Services (DHS) failed to establish by clear and convincing evidence that father "was statutorily unfit and that termination is in the children's best interests[.]" Having reviewed the record *de novo*, we reject that argument without further written discussion.[2] Father also argues that his parental rights cannot be terminated on conditions or circumstances extrinsic to the grounds that DHS proved at the jurisdictional hearing, as reflected in the jurisdictional judgment, because to do so would deprive father of constitutionally adequate notice "as to what, exactly, he * * * is supposed to be doing" to end DHS involvement. The juvenile court rejected that argument. We affirm, but on different grounds.

We begin with a brief discussion of the underlying facts—as we find them—leading up to the termination hearing. Father has four children: one daughter, J, and three sons. Father's three sons are the children at issue in this case. CM was 13 years old at the time of trial. CJ, who has autism, was seven years old at the time of trial. KD was six years old at the time of trial.

Father has a lengthy history of involvement with DHS in two separate states, generally for issues relating to his mental health, inadequate or dangerous housing, substance abuse, failure to protect some or all of his children from dangerous individuals, and neglectful conditions, such as inadequate nutrition and poor cleanliness and hygiene. Father underwent a psychological evaluation and was diagnosed with narcissistic personality disorder based, among

---

[1] At the termination trial, the juvenile court continued the TPR proceedings for father's 14-year-old daughter. She is not a party to this proceeding.

[2] We do, however, provide an overview of the relevant facts below.

other things, on his unrealistic beliefs about his ability to solve his personal and family problems, anger management issues, and lack of understanding of how his behaviors negatively affected his children. The doctor performing the evaluation recommended that father engage in individual behavioral treatment including treatment to help father identify negative thinking patterns that lead to poor choices that place the children at risk.

In July 2012, the juvenile court took jurisdiction over all four of father's children.[3] The grounds for jurisdiction primarily involved father's inability to protect his daughter, J, from multiple instances of sexual abuse and the children's exposure to incidents of domestic violence between father and his live-in girlfriend. After taking jurisdiction over all four children, DHS removed J from the home, but allowed the three boys to remain with father. At the outset, father participated adequately in services and kept his home at or above community cleanliness standards. Approximately one month after the court took jurisdiction, the two youngest children, KD and CJ, climbed out of an unlocked bedroom window while father was asleep. The boys were four and five years old at the time. They travelled approximately 400 yards from their house.

A passersby found the two boys roaming and playing in the middle of the "well-traveled" and "busy" roadway with a 35-mile-per-hour speed limit that runs near their house. Both children were wearing dirty clothes and had dirt "caked on" their faces; it appeared that they had not recently been bathed. CJ was wearing a soiled diaper, a shirt, and socks. He was not wearing pants or shoes. An officer changed CJ's diaper, finding dried feces around his buttocks and genitals, which had become inflamed and painful.

---

[3] In separate petitions for each of the three boys at issue in this case, DHS made substantially similar jurisdictional allegations relating to father's conduct:

"C. The child has been subjected to Threat of Harm: Physical Abuse and/or Mental Injury by the father, in that the child has been present during incidents of domestic violence between the father and his live-in companion.

"D. The child has been subjected to neglect and threat of harm in that the father has allowed dangerous and violent situations[] and individuals to reside with the child in the family home. As a result, the father has exposed the child to dangerous situations that pose a threat of harm towards the child."

Father had no knowledge that CJ and KD had left the house and gave officers, social workers, and the courts various accounts of when he had last checked on the children. Although the window was not locked, father had installed a child-safety gate with a pressure lock to prevent the children from leaving the front porch of the house. However, the gate did not present an obstacle to the boys.

At the termination trial, the officer who returned CJ and KD to the home testified about the conditions of the house, explaining that the house was "very dirty," and that he saw pet feces "all over" the living area, spoiled food sitting out on the counter, and a complete lack of bedding for the children. He noted that the children did have mattresses. He also described seeing several empty beer cans lying around and a sharp knife laying on the floor in reach of the children. Father attempted to explain the condition of the house, testifying that it had been extremely hot in the house, so he and the children spent their time outdoors but had continued placing trash inside the house.

As a result of that incident and the condition of the house, the juvenile court exercised jurisdiction over the three boys on two additional grounds.[4] DHS removed CM, CJ, and KD from father's care and placed them in substitute care, where they have been since that time.

[4] DHS again made substantially similar additional jurisdictional allegations relating to father's actions, which the court found, in separate petitions for each of the three boys. The additional jurisdictional grounds established by the court were:

"The circumstances and conditions of [the child] are such as to endanger his own welfare, in that:

"A. The child has been subjected to Neglect. On or about 08/18/12, the family home was found below minimum community standards for the health and safety of the child. There were numerous safety and health hazards throughout the home, including animal feces, decaying food, unsanitary living/sleeping conditions and large amounts of laundry and debri[s]. Additionally, the child found to be extremely soiled and dirty when contacted by [law enforcement agencies] and the child's sibling[s] disclosed he/they were not provided food on a regular basis.

"B. The child has been subjected to threat of harm and neglect, in that the child's father has failed to provide the child with adequate supervision. On or about 08/18/12, the child was found wandering along a busy street unsupervised. The father was unaware of the child's disappearance until contacted by law enforcement officers. The father was arrested and charged with Child Neglect 2."

Police also arrested father. He was ultimately convicted of one count of first-degree criminal mistreatment, and two counts of second-degree child neglect. He was sentenced to 25 months in prison, with a three-year term of post-prison supervision.

After his conviction and incarceration on the criminal mistreatment and child neglect charges, father enrolled in an alternative-incarceration program, in which he could obtain early release upon successful completion of the program. Father was ultimately removed from the program because of a lack of accountability for his crimes, among other things. Father completed a cognitive-treatment program, a parenting course, a faith-based life-training program, and a faith-based addiction program. Although at least one of those programs included some cognitive treatment, none of those programs included individual behavioral therapy to address father's personality disorder.

After the three boys were initially placed in substitute care, DHS permitted father to visit them, but visits were eventually terminated once father was incarcerated on the child-neglect and criminal-mistreatment convictions.

CM was 12 years old when he was first placed in foster care. At that time, he did not know how to perform basic tasks of daily living, such as taking a shower, drying off, or dressing himself in clean clothes. He could not tie his shoes or cut meat with a knife. CM hid food in his bedroom, had problems socializing with other children, and had an anger-management problem. He appeared depressed and anxious, expressed constant worry about his family and siblings, and was placed separately because of his "parentification," or belief that he needed to care for and parent his siblings. After a neuropsychological evaluation, CM was diagnosed with attention deficit/hyperactivity disorder (ADHD), anxiety disorder, and history of abuse and neglect.

CJ was five years old when DHS placed him in substitute care. As indicated, CJ has autism and had not been toilet trained. CJ's ability to speak was severely limited; he

could communicate with "very few" words. He frequently exhibited outbursts and extreme frustration, presumably because he could not communicate his needs. He frequently threw furniture, screamed, ran around the house turning off lights, shutting doors, and jumping on things. He would try to choke or scratch his foster parents if they got too close to his face. CJ could not bathe himself, was afraid of water, and screamed while his foster mother washed his hair. He also exhibited problems feeding himself. After an evaluation, CJ was diagnosed with an intellectual disability, an autism spectrum disorder, and speech delays. During the period between placement and the termination trial, CJ made rapid strides relating to his speech, toileting, and frustration. With the help of his foster parent, by the termination trial, CJ was toilet trained at home. However, CJ would not use toilets outside of the home. CJ could speak in 8- to 14-word sentences, communicate his needs, and no longer frequently resorted to tantrums, hitting, scratching, or choking. CJ improved his eating skills and his ability to use utensils. Within three months of placement, CJ no longer feared bath water.

KD was four years old when DHS removed him from father's home and placed him in foster care. At the time of placement, he exhibited "parentification" by expressing tremendous concern about CJ and about ensuring that CJ's needs were met, in addition to feeling guilty if he played with other children or did not spend time with CJ. He suffered lengthy tantrums, often kicking, screaming, punching things, and punching people. His foster parents had difficulty communicating with KD, who responded negatively to a firm tone of voice and timeouts, including making threats to kill everyone. After the first couple of months, both the frequency and length of KD's tantrums decreased from four or five nights per week to approximately once a month. Although KD had previously been on ADHD medication, his foster mother testified at trial that she hoped that, by changing the method that she used in interacting with KD, she would be able to avoid use of the medication. KD, like his brothers, received a psychological evaluation. He was diagnosed with ADHD, post-traumatic-stress disorder, and oppositional-defiant disorder.

As indicated, DHS filed a petition to terminate father's parental rights.[5] At the termination trial, father argued that he did not receive constitutionally adequate notice of the conduct and conditions that became the bases for termination of his parental rights because those conditions were not derived from the grounds for jurisdiction found in the jurisdictional judgment. Father argued that *Dept. of Human Services v. G. E.*, 243 Or App 471, 478-79, 290 P3d 891 (2011); *Dept. of Human Services v. N. M. S.*, 246 Or App 284, 294-95, 300, 260 P3d 516 (2011); and *Dept. of Human Services v. A. R. S.*, 256 Or App 653, 660, 303 P3d 963 (2013), supported his contention that his "parental

---

[5] The grounds on which the termination petition was based were as follows:

"5. The parental rights of the father to the above-named children should be terminated under ORS 419B.504 on the grounds that the father is unfit by reason of conduct or condition seriously detrimental to the children and integration of the children into the father's home is improbable within a reasonable time due to conduct or conditions not likely to change, including but not limited to the following:

"a) Criminal conduct that impairs the parent's ability to provide adequate care for the children.

"b) Incarceration that impairs the parent's availability to provide adequate care for the children.

"c) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"d) Exposure of the children to domestic violence.

"e) Lack of effort or failure to obtain and maintain a suitable or stable living situation for the children so that return of the children to the parent is possible.

"f) Failure to present a viable plan for the return of the children to the parent's care and custody.

"g) Failure to learn or assume parenting and/or housekeeping skills sufficient to provide a safe and stable home for the raising of the children.

"h) Mental, emotional, or psychological abuse of the children.

"i) An emotional illness, mental illness, or mental deficiency of such nature and duration as to render the parent incapable of providing care for extended periods of time.

"j) Failure to protect the children from sexual abuse.

"k) Physical and emotional neglect of the children.

"l) Lack of effort to adjust the parent's circumstances, conduct or conditions to make return of the child to the parent possible, or failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"6. It is in the children's best interests to be freed for adoption and be provided with the security of a permanent home."

rights cannot be terminated on conditions or circumstances extrinsic to those encompassed within the initial dependency petitions and jurisdictional judgments." Stated another way, father argues that, because the petition to terminate father's parental rights alleged that he was statutorily unfit under ORS 419B.504, the juvenile court could terminate father's parental rights only on the grounds on which it had originally assumed jurisdiction, including (1) exposing the children to domestic violence, (2) allowing unsafe individuals in the home, and (3) on one occasion, failing to supervise the children and maintain community standards of cleanliness in the home.

The juvenile court rejected that argument and terminated father's rights after a five-day trial. The court concluded that the cases father cited in support of his argument that he received insufficient notice were inapposite, because those cases were "permanency hearing cases and dependency cases, not termination of parental rights cases." The court explained the distinction as follows:

> "The dependency court can change the plan from 'return to parent' to adoption only if the parent has had an opportunity of notice of his parenting deficiencies so that he may address the parenting deficiencies through services and treatment. In this case, the [j]uvenile [c]ourt had already changed the plan to adoption and determined that the State of Oregon may file a new and separate petition to terminate the parental rights of the parent. This is in effect a new proceeding based upon the [termination] petition."

The juvenile court concluded that father had "clearly been on notice as to what services the Court and DHS were asking him to engage in" throughout the dependency proceeding, and that the services and treatment that the court and DHS required were also "rationally related to the conduct and conditions included in the termination of parental rights petition." Thus, the court rejected father's argument that he received insufficient notice, concluding that the termination petition, notice, and summons provided father with constitutionally sufficient notice.[6]

_____

[6] The court explained the rationale behind that conclusion:

"The Court concurs with the State that [f]ather has clearly been on notice as to what services the Court and DHS were asking him to engage in and

The court found that father's testimony pertaining to the care, supervision, and physical discipline of the children, in addition to his testimony about his alcohol use, was not credible. Ultimately, in a detailed, 15-page letter opinion, the court determined that father is unfit. The court based its conclusion on a multitude of findings, which included the criminal-mistreatment and child-neglect convictions which impair father's ability to provide adequate care for the children; father's incarceration; father's "addictive or habitual use" of alcohol; exposure of the children to domestic violence; father's failure to present to DHS a viable plan for return of the children; the mental abuse and physical and emotional neglect of the children; and "an emotional illness, mental illness, or mental deficiency of such nature and duration as to render [father] incapable of providing care for extended periods of time"—namely, father's narcissistic personality disorder. The court concluded that father's unfitness is seriously detrimental to the children and that it was in the children's best interest to terminate father's parental rights.

On appeal, father renews the arguments he made below. Father contends that the juvenile court's ruling is inconsistent with our opinions in *G. E.*, *N. M. S.*, and *A. R. S.* In father's view, those cases require the conclusion that the allegations in the termination petition did not provide him with constitutionally sufficient notice, and that the grounds

the reason why such services were required. The services and treatment, including mental health treatment at issue, were all rationally related to allegations of circumstances that brought his children into care. In addition, the service and treatment he was required to engage in rationally related to the conduct and conditions included in the termination of parental rights petition. Father's mental health condition and narcissistic personality disorder, while not specifically included in the jurisdictional allegations, explain conduct and conditions that impact parenting, domestic violence treatment, his ability to make changes following treatment, and his ability to meet the needs of his children['s] future.

"However, even if the court accepted [f]ather's broad construction of the cases he relies upon, evidence of [f]ather's mental health would still be relevant. It is the neglect, lack of supervision, unsafe and unskilled caregiving, and inability to protect the children from unsafe persons that provides the basis for original jurisdiction and for termination. The evidence demonstrates that these deficits are chronic and resistant to change, as demonstrated by the multiplicity of similar incidents in 2000, 2004, and 2012. Father's mental health diagnosis explains why, and how, such conditions could have been tolerated and why they are unlikely to change, but they are not, in and of themselves, the basis for termination."

on which the court based the termination of his parental rights were not "limited only to those unfitness grounds explicitly stated or fairly implied in the conditions or circumstances on which the juvenile court initially obtained jurisdiction." Thus, according to father, the juvenile court was precluded from terminating father's parental rights. In father's view, "[a]dequate notice is not provided by the termination petition itself" and the "proper procedure for addressing new or different parental deficits—which may arise after the jurisdictional judgments are issued—is to amend the dependency petitions."

DHS responds that father cites no authority for his argument that such a principle should apply to termination proceedings, and further notes that "none exists." Instead, DHS contends that father incorrectly relies on language from several permanency cases, "which hold that a juvenile court may not change a permanency plan for a child from reunification to adoption based on conditions or circumstances that are not explicitly stated or fairly implied by the jurisdictional judgment." DHS contends that our case law expressly declines "to extend those holdings to cases other than permanency cases in which the plan at the time of the permanency hearing was reunification" and that we should decline to extend the holdings to termination cases.

We need not address the merits of father's contention, because allegations (d), (e), (g), (j), and (k) contained in the termination petition are materially indistinguishable from the grounds on which the court asserted jurisdiction over the children. Consequently, father was on notice of those conditions and circumstances since the entry of the jurisdictional judgment. Furthermore, on *de novo* review, we conclude that DHS proved allegations (d), (e), (g), (j), and (k) by clear and convincing evidence and those allegations are sufficient to terminate father's parental rights. Accordingly, we affirm.

Affirmed.